Hillsborough,
No. 5579.

STATE

*v.*

ROGER F. COTE.

Argued May 2, 1967.
Decided October 31, 1967.

George S. Pappagianis, Attorney General and *Norman E. D'Amours,* Assistant Attorney General ( *Mr. D'Amours* orally ), for the State.

*King, Nixon, Christy & Tessier* ( *Mr. David L. Nixon* orally ), for the defendant.

*David C. Engel* ( by brief and orally ), as amicus curiae, pro se.

*Smith, Welts, Robertson & McGinnis* ( *Mr. Robert F. McGinnis* orally ), as amicus curiae, pro se.

*Anthony McManus* ( by brief and orally ), as amicus curiae, pro se.

*Leonard, Leonard & Prolman* ( *Mr. David M. Prolman* orally ), as amicus curiae, pro se.

*Clifford J. Ross* ( by brief and orally ), as amicus curiae, pro se.

LAMPRON, J. At about 7:10 A.M. on April 19, 1965, Ernest Bettez and his wife left their residence located at 150 Fieldcrest Road in Manchester which was then unoccupied until 12:05 P.M. when Ernest returned. Upon entering he discovered immediately that everything in the bedroom was "all upside down" and that a wall safe in a walk-in closet was gone. Also missing were $50, a Hamilton electric wrist watch, a bed spread, a bottle of wine in a box container, a bottle of whiskey and other articles. Bettez found that a window had been broken in the garage under the house which could provide entrance to the residence above it.

Robert Lemon, who then owned a 1962 blue and white Ford bearing Texas registration plates, picked up Roger Cote, the defendant, that morning and gave him a ride to a club located near the police station in Manchester. Lemon then parked his car nearby and joined his wife at the county courthouse, a short distance away, at about 10 A.M. Lemon and Cote had agreed to meet at this same club when Lemon had finished at the courthouse. When Lemon returned about 12:30 P.M. he could not find his car or Roger Cote. He testified he had not given Cote permission to use his car nor had he given Cote the keys to it but had them in his own pocket.

At about 11:30 A.M. that same morning, Daniel Boucher was driving to his home on Fieldcrest Road, a short street with five or six houses on it. He slowed his oil truck to allow a blue and white Ford with Texas plates to proceed. He saw two people in the front seat of this car which he later observed turning around on the street to proceed in the other direction, and later saw this car go by again and come to a stop but "didn't know where it was stopping."

That afternoon at about 1:30 P.M. a cab driver was called to the Cote home where he picked up the defendant and William Enright. He was directed by Cote to drive them to a sandpit where a new technical school was to be constructed. A Ford with Texas registration plates was there off the road in the sand up to its hubcaps. Cote asked the driver to pull this car out, which he was unable to do. Later that afternoon the Lemons discovered where their car was and the police were called to the scene.

In their investigation the police followed two sets of footprints which led away from this car and discovered the Bettez safe wrapped in a bed spread taken from the Bettez home. Based on his comparison of tire marks, and a large quantity of oil found on

the roadway at the Bettez home, a police officer testified that it was his opinion that the Lemon car was the vehicle which made those marks and left that oil at the Bettez residence.

Arthur Breton saw Roger Cote, the defendant, earlier that same afternoon of April 19, 1965, at a club in Manchester. Cote asked him to go to this same sandpit to pull a car out. Breton went there with his truck and found a blue and white 1962 Ford with Texas plates "bogged in sand." He did not even try to pull it out as he "felt it would be useless." On the way back Cote offered to sell Breton a Hamilton electric wrist watch which he purchased from the defendant for $15 and extinguishment of a debt of $20. This watch was later identified as the one taken from the Bettez home earlier that day.

The defendant Cote testified that some time after Lemon had left him at a club around 10 A.M. that same morning where he drank liquor, he met William Enright at a cafe where he had a bottle of beer. Enright "asked me if I had an automobile, and I said no, but I did have Mr. Lemon's car, and I says 'I don't have a license.' He says, 'I have' and requested to borrow the car to go over to the west side to see a girl friend of his . . . I went with him." The next thing Cote specifically remembered was "the engine was roaring wide open and the tires were spinning, and I could smell burned rubber and the car was rocking back and forth, and that is what woke me up." "When I started looking around I knew the place. I have lived next to the place for twenty years."

On cross-examination Cote admitted that his testimony as to the reason why Lemon would give him the key to his car as he had testified was done, "doesn't make much sense." He testified that he bought the Hamilton electric wrist watch from Enright for $10 and within a short time thereafter sold it to Breton. He also admitted that when he was asked by the police that evening if he had ever seen that watch "I told them I had never seen it before." The credibility of the witnesses was for the jury and they could disbelieve the exculpatory testimony given by the defendant. *State v. Reed*, 106 N. H. 140, 141; *Bird v. State*, 231 Md. 432.

On the evidence the jury could find beyond a reasonable doubt that Cote was present at the Bettez residence when the crime charged was committed; that he was closely associated with the automobile used to commit the crime, both before and after its commission; that he was in possession of a stolen article shortly

after the crime was committed; that he was a perpetrator of the burglary at the Bettez residence. *State* v. *Enright*, 108 N. H. 227; *State* v. *Rumney*, 108 N. H. 40; *State* v. *Amero*, 106 N. H. 134; See *State* v. *Santos*, 107 N. H. 490. Defendant's motions based on the insufficiency of the evidence to sustain a verdict that he was guilty of the crime charged in the indictment were properly denied and his exceptions thereto are overruled.

During the cross-examination of the defendant, the State was allowed, over objection, to ask him, limited to his credibility as a witness, about his conviction on November 4, 1950 of the crime of breaking, entering and larceny. He was also cross-examined for the same purpose, again over objection, about his convictions for assult, drunkenness, leaving the scene of an accident, driving without a license "a number of times," wanton damage to property, and "derisive words."

Defendant argues that his constitutional rights to a fair trial, due process, and equal protection of the law have been violated by permitting his record of prior convictions to be "paraded" before the jury and that his conviction which resulted from prejudice and not evidence should be overturned and a new trial ordered. Defendant further maintains that the rule in New Hampshire permitting "conviction — cross - examination" of defendants is "contrary to the intent of the enabling statute [Laws 1871, 38:1, now RSA 516:33] outmoded, and totally ineffective, in its reliance on limiting instructions to protect respondents against undue prejudice." *Amici curiae* supported these contentions.

The law is well established in this State and elsewhere that evidence of prior convictions of crime is inadmissible at a criminal trial either to establish guilt or to show that a defendant would be likely to commit the crime with which he is charged. *State* v. *Travis*, 82 N. H. 220; *Lane* v. *Warden, Maryland Penitentiary*, 320 F. 2d 179, 181 ( 4th Cir. 1963 ); *Whitty* v. *State*, 149 N. W. 2d 557, 563 ( Wis. 1967 ); *People* v. *Kelley*, 424 P. 2d 947, 953 ( Cal. 1967 ). The main reason for such exclusion is the potentiality for prejudice of such evidence, the possibility that the generality of the jury's verdict might mask a finding of guilt based on an accused's past crimes. *Spencer* v. *Texas*, 385 U. S. 554, 560.

However, evidence of prior crimes committed by the defendant is admitted when "it is particularly probative in showing such things as intent . . . an element in the crime . . . identity . . .

malice . . . motive . . . a system of criminal activity . . . or when the defendant has raised the issue of his character . . . or when the defendant has testified and the State seeks to impeach his credibility . . . .

"In all these situations . . . the jury learns of prior crimes committed by the defendant, but the conceded possibility of prejudice is believed to be outweighed by the validity of the State's purpose in permitting introduction of the evidence. The defendants' interests are protected by limiting instructions . . . and by the discretion residing with the trial judge to limit or forbid the admission of particularly prejudicial evidence even though admissible under an accepted rule of evidence." *Spencer* v. *Texas,* 385 U. S. 554, 560, 561.

. Prior to July 13, 1871, when the predecessor of RSA 516:33 was adopted ( Laws 1871, 38:1 ), it was held in New Hampshire in accordance with the prevailing common law that a person convicted of an infamous crime was incapacitated from being a witness on the ground that his conviction was such an impeachment and condemnation of his general character for truth that he was rendered incompetent to testify. See *State* v. *Archer,* 54 N. H. 465, 467. RSA 516:33 reads as follows: "No person shall be incompetent to testify on account of his having been convicted of an infamous crime, but the record of such conviction may be used to affect his credit as a witness." Its main purpose was to remove the disability of such convicted person to be a witness. 2 Wigmore, Evidence ( 3d *ed.* ) *s.* 524, *p.* 617. It is unnecessary to interpret that part of the statute dealing with the use of the record of conviction to affect the credibility of such a witness as we are dealing in this case with impeachment of the witness by cross-examination as to relevant matters which tend to discredit him, including prior convictions of crimes. 58 Am. Jur., Witnesses, *ss.* 687, 734, *pp.* 373, 397; 42 B. U. L. Rev. 91, 95.

This court in *State* v. *Duke,* 100 N. H. 292 ( decided in 1956 ) made the following statements at pages 293, 294 pertaining to this type of attack on the credibility of the defendant as a witness:

"We are aware of the arguments for a rule which would limit impeachment in such cases to crimes directly involving lack of veracity. See 89 U. Pa. L. Rev. 166; Am. Law Inst., Model Code of Evidence, Rule 106 (1) (b); *Id.,* 341 [ also Rule 21, 9a U.L.A., *pp.* 607, 608 ]. It seems to us that such a rule represents too

narrow and artificial a view. The object of a trial is not solely to surround an accused with legal safeguards but also to discover the truth. What a person is often determines whether he should be believed. When a defendant voluntarily testifies in a criminal case he asks the jury to accept his word. No sufficient reason appears why the jury should not be informed what sort of person is asking them to take his word. In transactions of everyday life this is probably the first thing that they would wish to know . . . . Lack of trustworthiness may be evinced by his abiding and repeated contempt for laws which he is legally and morally bound to obey . . . though the violations are not concerned solely with crimes involving 'dishonesty and false statements.' *Cf.* American Law Institute, *supra,* 341. Such evidence may well have more probative value as bearing on credibility than a conviction of a single felony committed in a moment of weakness or passion, though the admissibility of such convictions is clearly established. See *State* v. *Mihoy,* 98 N. H. 38, 40, 41, and authorities cited; see also, RSA 516:33."

Under this practice, which has existed in this State for many years ( 42 B.U.L. Rev. 91, 95 ), the defendant is put to the same credibility test as any other witness. See *State* v. *Ober,* 52 N. H. 459, 463. The defendant "has the choice, after weighing the advantage of the privilege against self-incrimination against the advantage of putting forward his version of the facts and his reliability as a witness, not to testify at all. He cannot reasonably claim that the Fifth Amendment gives him not only this choice but, if he elects to testify, an immunity from cross-examination on the matters he has himself put in dispute. It would make of the Fifth Amendment not only a humane safeguard against judicially coerced self-disclosure but a positive invitation to mutilate the truth a party offers to tell." *Brown* v. *United States,* 356 U. S. 148, 155, 156; *State* v. *Ober, supra; United States* v. *Pate,* 357 F. 2d 911, 915 ( 7th Cir. 1966 ); *State* v. *Robideau,* 425 P. 2d 880, 882, 883 ( Wash. 1967 ). Nor does our procedure allowing cross-examination of a defendant as to prior convictions of crime to impeach his credibility as a witness deny him the fundamental fairness or the equal protection of the laws guaranteed by the Fourteenth Amendment of the Federal Constitution. *Spencer* v. *Texas,* 385 U. S. 554, 564, 565; *United States* v. *Pate, supra.* Such a procedure does not violate our State Constitution. *State* v. *Fogg,* 80 N. H. 533, 535.

Such cross-examination of a defendant must always be under the close control of the Trial Court in the exercise of its discretionary powers. *State* v. *Duke*, 100 N. H. 292, 294. In exercising this supervision the Trial Court should bear in mind that the use of prior convictions to show nothing more than a disposition to commit crime, or the crime currently charged, would violate the Due Process Clause of the Fourteenth Amendment. *Michelson* v. *United States,* 335 U. S. 469, 475-476. It should also consider the fact that prior convictions have an inherent prejudicial effect and are admitted to impeach the defendant's credibility only because the possibility of prejudice resulting from their introduction in evidence is thought to be outweighed by the legitimate purpose served by it. *Spencer* v. *Texas,* 385 U. S. 554, 562. See *Luck* v. *United States,* 348 F. 2d 763, 767, ( D.C. Cir. 1965 ). The Trial Court must instruct the jury at the time such evidence is admitted and in the final instructions that it is to be used only to evaluate the credibility of the defendant as a witness and is not to be considered as proof of his guilt of the offense being tried. *State* v. *Mihoy,* 98 N. H. 38, 40, 41.

Furthermore care must be taken by the Trial Court that the cross-examination relating to prior convictions is not conducted in such a manner as to cause undue prejudice to the defendant. The Court should not permit questions pertaining to matters which " seem unduly prejudicial, or too trifling or remote in time to have a real bearing on credibility." *State* v. *Duke,* 100 N. H. 292, 294. Questions about prior convictions so linked with other questions by the cross-examiner as to suggest to the jury that those convictions are an indication that the defendant is guilty of the crime being tried should be excluded, as should questions making undue reference by repetition or otherwise to the prior convictions of the defendant. See *Commonwealth* v. *Davis,* 396 Pa. 158, 162, 163.

*State* v. *Duke,* 100 N. H. 292 has been re-examined in the light of subsequent State and Federal decisions and other sources. *Spencer* v. *Texas,* 385 U. S. 554; *State* v. *Robideau,* 425 P. 2d 880 ( Wash. 1967 ); *United States* v. *Pate,* 357 F. 2d 911 ( 7th Cir. 1966 ); 19 Okla. L. Rev. 430 ( 1966 ); 34 Fordham L. Rev. 107, 111, 119 ( 1965 ); 78 Harv. L. Rev. 426, 440, 441. We affirm the holding in *State* v. *Duke, supra.* However, to aid the Trial Court in carrying out the principles therein enunciated we have deemed it proper to elaborate on certain considerations

and procedures to be followed by the Court in this area of cross-examination as to prior convictions of crime to impeach the credibility of the defendant in a criminal case as a witness.

*Exceptions overruled.*

All concurred.