Rockingham
No. 7684

THE STATE OF NEW HAMPSHIRE

v.

NEIL A. LINSKY
STEPHEN H. ROTH
JAY H. ADAMS
MICHAEL C. CUSHING
ROBERT R. CUSHING, JR.
MARY F. GREGORY
MEDORA HAMILTON
KEVIN J. HOPKINS
ANN CAROL RILEY
BRIAN CULLEN

October 31, 1977

*David H. Souter*, attorney general, and *Edward A. Haffer*, assistant attorney general (*Mr. Haffer* orally), for the state.

*Rosenberg, Baker & Fine*, of Boston, Massachusetts, *Brown & Nixon*, of Manchester, and *Kearns & Colliander*, of Exeter (*Mr. David Rosenberg* and *Mr. David L. Nixon* orally), for the defendants.

LAMPRON, J. On July 29, 1976, Properties, Inc., and Public Service Company of New Hampshire petitioned the Rockingham County Superior Court for an injunction. The plaintiffs who are in the process of constructing a nuclear power plant in Seabrook were thereby attempting to prevent a demonstration against the power plant from occurring on the construction site. The superior court denied the petition without prejudice on July 30, 1976.

On August 20, 1976, the above plaintiffs joined by certain labor unions, whose members are employed in the construction of the plant, filed a motion to amend and bring forward the July 29, 1976 petition. In that petition, plaintiffs Properties and Public Service had alleged that certain groups were planning to enter and occupy the described nuclear plant site on August 1, 1976, in sufficient numbers to stop its construction. The amended petition of August 20, 1976, additionally alleged in part that since June 1976, numerous Public Service offices and substation sites in the area of the nuclear plant had been victimized and vandalized and no-trespassing signs on the plant site had been torn down and destroyed. On August 1, 1976, approximately fifty persons, among whom were the defendants, had aproached the site via a B & M Railroad right-of-way and conducted themselves in such a manner "as to hinder and impede the criminal justice system."

The amended petition also alleged that on August 5, 1976, at a ground-breaking ceremony on the site, a large group of demonstrators had blocked traffic upon a public way creating a danger to themselves and to persons traveling to and from the site. It was also alleged that the defendants were planning a large rally at about 1:00 p.m. on August 22, 1976, at Hampton Falls Common, and thereafter planned to occupy the site with 200 to 400 people. The goal of all these incidents was to impede the construction of the plant by acts of civil disobedience, *see* RSA 635:2, and to clog the court dockets to render the criminal justice system ineffective.

On August 20, 1976, the Superior Court (*Bois*, J.) granted plaintiffs' motion to amend and bring forward the prior petition. On the

same date the court also granted *ex parte* plaintiffs' prayer for a temporary injunction enjoining and restraining the defendants from entering upon the site of the plant without the express permission of the Public Service Company; occupying the site; obstructing the entrance or exit of any person to or from the site; destroying or damaging any property of plaintiffs or of any other person lawfully upon the site; and committing any other act that will obstruct the activities on the site. However, on August 22, 1976, about 200 demonstrators entered the site and were arrested.

On the same day the court was presented affidavits alleging that the defendants, without the express permission of Public Service, intentionally and with knowledge of the above injunction went upon the nuclear plant site and engaged in conduct in violation of the injunction, which constituted a contempt of the court. The defendants were arrested and pleaded not guilty to the charge of contempt when arraigned on August 23, 1976.

Between the latter date and the trial, which took place from August 31 to September 3, 1976, defendants made several motions, among which were motions for a jury trial, for continuance, for the Trial Justice (*Bois,* J.) to recuse and disqualify himself, for discovery, and motions by Thomas Lesser, Esq., and Jim Starr, Esq., both from Massachusetts, to withdraw as counsel. All of these motions were denied and defendants excepted. After a hearing all defendants were found guilty. Each was sentenced to the county house of correction for a period of 6 months, of which 3 months was suspended. All exceptions taken by the defendants before, during, or after the trial were reserved and transferred.

I. *Evidence That the Injunction Was Violated.*

■ This is a criminal contempt proceeding. *State v. Towle,* 42 N.H. 540 (1861); *Duval v. Duval,* 114 N.H. 422, 425, 322 A.2d 1, 3, (1974). Hence, the state must prove the elements of its case beyond a reasonable doubt. *In re Winship,* 397 U.S. 358 (1970); *see State v. Matthews,* 37 N.H. 450, 456 (1859). The state therefore had the burden to prove beyond a reasonable doubt the existence of an injunction whose terms covered the defendants, and that defendants had notice thereof and intentionally committed one or more of the proscribed acts. The defendants claim that the state did not meet its burden. "On review, the evidence must be considered in the light most favorable to the state with all reasonable inferences therefrom." *State v. Gilbert,* 115 N.H. 665, 666,

348 A.2d 713, 714 (1975); *In re Joyce,* 506 F.2d 373 (5th Cir. 1975).

The defendants contend that even though they entered the premises, the terms of the injunction were not violated, and therefore the state has not proven its case beyond a reasonable doubt. The terms of the injunction that are relevant here are those which specifically restrained the defendants from entering the described premises "without the express permission of Properties, Inc. and Public Service Company of New Hampshire," or occupying the site. The defendants claim that they were given permission to enter the site, the ban on entry was thus waived, and they did not occupy the site as that term was used in the injunction.

The evidence shows that the defendants were among 200 demonstrators who approached the construction site by a railroad right-of-way which passed through the enjoined premises. The demonstrators planned to continue walking on the railroad tracks through the construction site until they were arrested for trespass. Before their arrival, a chain was placed by Public Service across the railroad tracks at the point where the tracks entered the construction site. The Boston & Maine Railroad had granted permission to Public Service to exclude people from the railroad tracks on the day of the demonstration. To the left of the demonstrators as they approached the chain was a snow fence running along the boundary of the enjoined premises. Where the snow fence and the chain joined there was an open space large enough for people to move through. The demonstrators were therefore thwarted in their plan to walk along the railroad tracks through the site. Rather than step over the chain and be confronted with police officers who were positioned beyond the chain, the demonstrators, after some discussion, decided to go through the opening between the snow fence and the chain. They entered the enjoined premises, sat down, and were later arrested.

The state's evidence concerning whether permission had been granted came from John Herrin, the construction site manager for Public Service Company of New Hampshire. Herrin was the representative of his company that day and therefore he was the one individual who could grant or deny permission to enter. Herrin testified that he never gave permission to any of the defendants to enter the premises, and told the group of demonstrators over a loud speaker that they were not allowed on the premises. When the demonstrators entered the premises, the police did not

resist, but instead allowed the demonstrators to enter in order to prevent a confrontation, and kept them in a confined area to facilitate the arrests. We hold that on the evidence before the court, viewed in its entirety, it could be found that the defendants entered the premises without permission. *State v. Breest,* 116 N.H. 734, 741, 367 A.2d 1320, 1326 (1976). By the terms of the injunction, one would be in violation of it by entering the land without more. The affidavit concerning violation of injunction charges that the violation occurred when the defendants did "go upon" the premises. We also hold that the defendants were "occupying" the premises in its common and approved usage in the context of the injunction. *See* RSA 21:2.

## II. *Notice and Intent.*

██ In order to find a person guilty of criminal contempt for violating an injunction, that person must have knowledge or notice of the injunction, 43 C.J.S. *Injunctions* § 261 (1945); F. Wharton, Criminal Law and Procedure § 1348 (R. A. Anderson ed. 1957), and the violation must have been intentional. These two elements are interrelated since it is inconceivable that a person could intentionally violate an injunction without having knowledge or notice of the injunction. Being necessary elements for criminal contempt, they must be proved beyond a reasonable doubt. *In re Winship,* 397 U.S. 358 (1970).

██ The defendants contend that they were not given the type of notice demanded by due process. *See Mullane v. Central Hanover Bank and Trust Co.,* 339 U.S. 306 (1950). Their claim is based on the evidence elicited at the trial that only two of the defendants, Linsky and Roth, received in-hand service of the injunction. We need not reach the due process argument of the defendants. Even though in-hand service may not have been made to eight of the defendants, actual service is not required to find the necessary element of notice. In fact, a party to an injunction may be chargeable with notice of the injunction in certain cases, even though he does not have actual notice. 43 C.J.S. *Injunctions supra;* F. Wharton *supra.* It is not necessary to determine whether this rule is applicable in the present case, for a party who has actual knowledge or notice of the injunction is bound by the injunction and can be punished for contempt, even though he has not been served or the service was defective. *Fowler v. Beckman,* 66 N.H. 424, 30 A. 1117 (1891).

██ The evidence presented at trial shows that defendants Linsky and Roth had in-hand service, and defendant Robert Cushing, although not in-hand, read a copy of the injunction before the demonstration. Whether the other defendants had knowledge of the injunction is a question of fact, proof of which may be circumstantial. *Walker v. City of Birmingham,* 388 U.S. 307 (1967). The evidence shows that copies of the injunction were posted at various places where the defendants would have been able to read them. The injunction was read over a loudspeaker system to the defendants at the place where they organized prior to the walk to the enjoined premises, and again after they reached the enjoined premises. Despite defendants' factual argument in their brief, we hold that there is sufficient evidence in the record to support the finding that the defendants had knowledge of the injunction. *State v. Gilbert,* 115 N.H. 665, 348 A.2d 713 (1975).

██ The defendants also press a factual argument upon us that they did not intend to violate the injunction. Whether a defendant has the requisite intent for a crime may be established by circumstantial evidence. *State v. Nelson,* 103 N.H. 478, 486, 175 A.2d 814, 820 (1961). Various defendants testified that they did not intend to violate the injunction. The trier of fact can choose to disbelieve exculpatory testimony given by a defendant. *State v. Cote,* 108 N.H. 290, 293, 235 A.2d 111, 114 (1967). When the evidence is viewed most favorably to the state, *State v. Gilbert,* 115 N.H. 665, 348 A.2d 713 (1975), we hold that a fair-minded and reasonable trier of fact could accept the evidence as proof of intent beyond a reasonable doubt. *In re Joyce,* 506 F.2d 373, 376 (5th Cir. 1975). We are not convinced by defendants' argument that their so-called acts of symbolic trespass did not impair the integrity or process of the court which issued the injunction and did not constitute a contumacious intent. Nor can we hold that there was entrapment as a matter of law. RSA 626:5; *State v. Bacon,* 114 N.H. 306, 319 A.2d 636 (1974).

III. *The Injunction.*

The defendants attempt to attack the validity of the injunction by claiming that the court below had no power and jurisdiction to issue it because it was not shown that there was imminent danger of great and irreparable injury, furthermore that there was an adequate remedy at law, and that equity does not enjoin criminal acts. It is their conclusion that they cannot be found in contempt of an

injunction which should not have been issued due to one of these equitable principles.

It is the rule in this state, as it is in most jurisdictions, *see* 12 A.L.R.2d 1059 (1950), that an injunction rendered by a court having jurisdiction cannot be impeached collaterally in a contempt proceeding, but only by a direct attack on appeal. *State v. Kennedy,* 65 N.H. 247, 23 A. 431 (1889). The reference in this rule to jurisdiction is that of subject matter, and not to equitable principles which are loosely referred to as equity jurisdiction. 1 Pomeroy, Equity Jurisprudence § 129 (5th ed. 1941); D. Dobbs, Remedies § 2.7 (1973); *see Moore v. McAllister,* 216 Md. 497, 141 A.2d 176 (1958). Defendants' arguments concerning irreparable injury and criminal acts are concerned with the historic principles of equity which determine whether the party seeking relief is entitled to it. They do not involve the power of the court to adjudicate the controversy, so these issues cannot be raised in this contempt proceeding. The issue of whether there is an adequate remedy at law is not to be confused with the equitable principle which determines whether the court will exercise its discretionary and extraordinary powers. "There is a wide distinction between declining to act because the case is not thought to require it, and not doing the same thing because the court is without power." *Wason v. Sanborn,* 45 N.H. 169, 171 (1862). The threshold for invoking equitable jurisdiction in this state is low. "No jurisdiction can be more ample and unqualified than that of this court in cases of injunction." *Id.* The jurisdiction of the court is determined in the first instance by whether the plaintiff's pleadings "reveal adequate jurisdictional facts." *Rau v. N.H. Division of Welfare,* 115 N.H. 156, 158, 335 A.2d 657, 658 (1975); *Hatch v. Hillsgrove,* 83 N.H. 91, 93, 138 A. 428, 430 (1927); D. Dobbs, Remedies § 2.7, at 82–83 (1973).

Plaintiffs' amended petition states adequate facts for the court's equity jurisdiction to be invoked. The amended petition alleges a prior instance of trespass on the construction site by the defendants and an intention by the defendants to trespass in the near future. Repetition of trespasses is a common ground for finding the legal remedy to be inadequate. 4 Pomeroy, Equity Jurisprudence § 1357 (5th ed. 1941); 42 Am. Jur. 2d *Injunctions* §§ 143, 149 (1969). "Although equity will not interfere in the case of a trespass which is temporary in its nature and effect, and for which

the legal remedy of an action at law is adequate, yet if the trespass is a continuous one or if repeated acts of wrong are done or threatened, although each act by itself may not be destructive or cause irreparable injury, and for which if it stood alone an action at law might be an adequate remedy, the entire wrong may be prevented or stopped by injunction, on the ground of preventing a multiplicity of suits and the inadequateness of the legal remedy." *Ellis v. Blue Mountain Forest Assoc.*, 69 N.H. 385, 388, 41 A. 856, 857 (1898). We therefore hold that the court had jurisdiction to issue the injunction. Defendants' other arguments concerning the injunction deal with whether the court erred under equitable principles in granting the injunctive relief and cannot be raised collaterally in this proceeding. The argument that *Walker v. City of Birmingham*, 388 U.S. 307 (1967), does not bar attacking the injunction because the defendants had attempted to have the order modified is inapplicable. The record indicates that two of the defendants received in-hand service the day the injunction was issued, yet no attempt was made to modify the injunction until two days later, on Sunday, hours before the planned demonstration. We cannot say that under these circumstances the defendants so diligently pursued modification of the injunction so as to make the instant case an exception to *Walker*.

## IV. *The First Amendment.*

The defendants base two issues on the premise that their activity was protected by the first amendment. First, it is their contention that the order in this case was broader than necessary for the protection of interests jeopardized by their trespass. They base this argument on the language in *Carroll v. Princess Anne*, 393 U.S. 175, 183 (1968), that "[a]n order issued in the area of First Amendment rights must be couched in the narrowest terms that will accomplish the pin-pointed objective permitted by constitutional mandate and the essential needs of the public order." Second, the defendants contend that the temporary injunction was void because it was issued *ex parte*, and "there is no place within the area of basic freedoms guaranteed by the First Amendment for such orders where no showing is made that it is impossible to serve or to notify the opposing parties and to give them an opportunity to participate." *Id.* at 180. We note that *Walker v. City of Birmingham*, 388 U.S. 307 (1967), could be read as foreclosing these issues. However, it is not clear whether *Walker* would foreclose an

attack under *Carroll* on the *ex parte* issuance of the injunction, and we will therefore consider it here.

The defendants' reliance on the first amendment to find protection for their activity is misplaced. The act involved in this case is a trespass on private property. The Supreme Court of the United States at one time held that the first amendment would protect peaceful picketing, which involves elements of both speech and conduct, on privately owned property that was being used as the functional equivalent of a business district. *Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza, Inc.,* 391 U.S. 308 (1968). The Court retreated from this position in *Lloyd Corp. v. Tanner,* 407 U.S. 551 (1972), and in its opinion emphasized the fact that it "has never held that a trespasser or an uninvited guest may exercise general rights of free speech on property privately owned and used nondiscriminatorily for private purposes only." *Id.* at 568. The most recent case on this issue, *Hudgens v. N.L.R.B.,* 424 U.S. 507 (1976), specifically rejected the holding in *Logan Valley supra.* Since defendants' activity was not protected by the first amendment, the temporary injunction and its *ex parte* issuance were not violative of *Carroll v. Princess Anne supra.* The Supreme Court recognizes that outside the first amendment there is a place for the *ex parte* issuance of temporary injunctions for short durations. *Carroll v. Princess Anne,* 393 U.S. at 180. We hold that the *ex parte* issuance of the temporary injunction in this case was proper.

## V. *Continuance and Counsel.*

On August 23, 1976, the ten defendants were brought into the Rockingham County Superior Court (*Bois,* J.) and informed of the charges against them for violating the injunction. The court informed each defendant of his right to counsel. Two Massachusetts attorneys, Starr and Lesser, were present in the courtroom along with two New Hampshire attorneys, Robbins and Kearns. The court allowed the defendants to consult with the attorneys. After the consultation, the court was informed that defendant Ann Carol Riley would be represented by Mr. Kearns. Mr. Kearns also filed an appearance for Brian Cullen on August 30, 1976, the day before the trial was to begin. The other defendants would be represented by the two Massachusetts attorneys, who filed general appearances, and Mr. Robbins, who agreed to represent the nine defendants only at the bail hearing on August 23, 1976. All parties were in-

formed that another New Hampshire attorney should be retained for the trial if Mr. Robbins decided not to continue his appearance beyond the bail hearing. Just prior to the adjournment that day, Mr. Lesser suggested that an appropriate date for the trial would be August 31, 1976.

Mr. Robbins subsequently withdrew from the case. The day before the trial was to begin, Mr. Starr moved for a continuance on the grounds that local counsel had not been retained and that he had prior commitments for the next two days and was therefore not prepared to proceed. The court waived the local counsel requirement and denied the motion. Mr. Starr objected to this because he was under the impression that local counsel would be required and he needed local counsel because he was not sufficiently familiar with New Hampshire law to adequately represent his clients. He then requested that he be allowed to withdraw, which the court denied. The court emphasized the fact that the two Massachusetts attorneys had filed a general appearance and the trial would begin the next morning as scheduled.

On the morning of the trial, Mr. Lesser filed a motion to withdraw based on the ground that the eight defendants had discharged him the night before because they felt he could not adequately represent them. Mr. Lesser explained to the court that he was not familiar with New Hampshire law and was unprepared to proceed without local counsel. The eight defendants represented by Messrs. Starr and Lesser moved to dismiss them as counsel. The court denied both motions. These eight defendants then requested to proceed pro se. The court allowed them to proceed pro se, with Mr. Lesser as standby counsel. *See Mayberry v. Pennsylvania,* 400 U.S. 455, 467–68 (1971) (Burger, C.J., concurring). Mr. Kearns then made a motion for a continuance for his two defendants on the ground that he was not prepared to begin the trial that day. The court denied the motion.

From these facts we must determine whether the defendants were denied due process by the trial court's failure to grant a continuance. Reviewing the denial of a continuance places an appellate court in a difficult position. The trial judge is in a better position to determine whether there is an actual need for a continuance or if the defense is engaging in dilatory tactics. It is for this reason that the matter of a continuance is within the sound discretion of the trial judge. *Ungar v. Sarafite,* 376 U.S. 575, 589 (1964). *See generally Assuring the Right to an Adequately Pre-*

*pared Defense*, 65 J. Crim. Law and Criminology 302 (1974). This does not mean, however, that a denial of a continuance will be treated superficially on review. Without adequate time to prepare a defense, a criminal defendant's right to effective assistance of counsel is reduced to a mere pretense. *See Powell v. Alabama*, 287 U.S. 45 (1932). A balance must be reached between the need for a speedy trial and a defendant's need to prepare his defense. There are no mechanical tests to determine when due process has been violated by the denial of a continuance, but in each case the totality of the circumstances must be considered.

In the present case we do not find such an abuse of discretion by the trial court that the defendants were denied effective assistance of counsel. The trial date was not mandated by the court, but was selected by the attorneys. They had eight days before the trial to prepare the defense. This is not an inadequate period of time when the evidence is fresh and the issues for trial are limited. The action of the trial judge does not present "a myopic insistence upon expeditiousness in the face of a justifiable request for delay . . . ." *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964). The motions for the continuances did not present any facts to the trial court from which this court can say the denial of the continuance was so arbitrary that due process was violated.

We also do not find error in the circumstances surrounding the decision of the eight defendants represented by Mr. Lesser to proceed pro se. A criminal defendant has a right to proceed pro se, *Faretta v. California*, 422 U.S. 806 (1975), but this decision must be knowing and intelligent, *id.* at 835, and a free and meaningful choice. The defendants contend that their decision was not voluntary because they were faced with a choice of representing themselves or being represented by an unwilling, unprepared lawyer they had attempted to dismiss.

The defendants in this case voluntarily selected the two Massachusetts attorneys to represent them. The defendants did not attempt to dismiss their counsel until the day of the trial. The right to counsel of one's choice is not unlimited, and a court can compel a defendant to go to trial with present counsel if the court determines, within its sound discretion, that the objections to counsel are dilatory tactics or otherwise unwarranted. *Maynard v. Meachum*, 545 F.2d 273 (1st Cir. 1976); *Lofton v. Procunier*, 487 F.2d 434 (9th Cir. 1973). This case does not present the situation

where the defendants were forced to proceed pro se by the court. *See Commonwealth v. Cavanaugh,* 353 N.E.2d 732 (Mass. 1976); *State v. Renshaw,* 276 Md. 259, 347 A.2d 219 (1975). Rather, the defendants unequivocally chose to represent themselves. The trial court also appointed one of their Massachusetts counsel, Mr. Lesser, as "standby counsel" ready to perform "all the services a trained advocate would perform ordinarily . . . ." *Mayberry v. Pennsylvania,* 400 U.S. 455, 467–68 (1971) (Burger, C.J., concurring).

Both attorneys Lesser and Starr filed several motions before trial on behalf of their clients, none of which appears from the record to have been denied for failure to conform to New Hampshire procedural requirements. Most, if not all, the federal constitutional issues raised by the defendants would most likely be treated similarly under New Hampshire or Massachusetts practice. The principal issue of whether the ten defendants entered the site in violation of the court injunction was common to all of them. Attorney Kearns, New Hampshire counsel who represented two of the defendants, was interested in presenting in defense of his clients matters which would most likely benefit all ten defendants. All defendants were found guilty. Given the background of the defendants as revealed by the record, as well as the totality of all the circumstances, we cannot hold as a matter of law that the defendants were forced to proceed with attorneys who could not serve them competently. We further hold that under the circumstances the defendants were capable and intelligently and voluntarily did waive their right to counsel and were not denied due process.

## VI. *Jury Trial.*

It is defendants' contention that they were entitled to a jury trial. The trial judge made it clear from the beginning of the case that he would not impose a sentence greater than six months if they were found guilty. The defendants were therefore not entitled to a jury trial either under the law of this state, *State v. Matthews,* 37 N.H. 450, 456 (1859), or the United States Constitution. *Codispoti v. Pennsylvania,* 418 U.S. 506 (1974); *Taylor v. Hayes,* 418 U.S. 488 (1974).

The defendants' claim that by charging them with criminal contempt they were automatically "shorn of their jury trial right" and the state therefore has created "two classes of crimes,

those where the right to a jury trial is guaranteed, and another comprised essentially of contempt cases, where the right is denied." The defendants were not automatically "shorn" of their jury trial right. A right to jury trial does not exist in New Hampshire criminal contempt cases, though it does in prosecutions for other crimes. *State v. Matthews, supra* at 456. *But see Bloom v. Illinois*, 391 U.S. 194 (1968) for cases involving sentences over six months. The defendants were not given a jury trial in this case because the trial court stated at the outset that he would not impose a sentence of greater than six months, in accordance with *Taylor v. Hayes*, 418 U.S. 488 (1974). We cannot say that this is a violation of equal protection.

## VII. *Motion to Recuse.*

Defendants maintain that the trial court erred in refusing to disqualify itself. They base their contention mainly on (1) N.H. Const. pt. I, art. 35 which provides in part as follows: "It is the right of every citizen to be tried by judges as impartial as the lot of humanity will admit;" (2) Canon 3 C(1) of the Code of Judicial Conduct (ABA 1972) adopted by this court as Rule 25, Canon 3 C(1), which provides that a "judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned . . . ." RSA 490: App. R. 25 C(1) (Supp. 1975), (3) General principles of due process. *See Connally v. Georgia*, 97 S. Ct. 546 (1977). We are of the opinion that the above bases for recusal have a generally common test which is set out in *Ungar v. Sarafite*, 376 U.S. 575, 588 (1964). There must exist bias, or such likelihood of bias, or an appearance of bias that the judge is unable to hold the balance between vindicating the interests of the court and the interests of the accused. *See N.H. Milk Dealers Ass'n v. Milk Control Board*, 107 N.H. 335, 338, 222 A.2d 194, 198 (1966); *Cheshire v. Keene*, 114 N.H. 56, 59, 314 A.2d 639, 641 (1974). Specifically the defendants maintain that the trial court (1) prejudged critical issues; (2) had personal knowledge of disputed evidentiary facts; and (3) became personally embroiled in the case so that he became more involved in the prosecution of the case than in its adjudication.

Many of the statements relied on by defendants to show prejudice were made at the arraignment. However, the record also contains other statements by the court to the effect that it was not prejudging the guilt of the defendants and would reach a verdict

on the evidence. The defendants claim that an impartial judge does not need to make such statements and therefore a disclaimer of prejudgment shows bias. Adherence to this argument would produce a somewhat novel rule of law. "The characterization of the petitioner's conduct as contemptuous, disorderly, and malingering was at most a declaration of a charge against the petitioner, based on the judge's observations, which, without more, was not a constitutionally disqualifying prejudgment of guilt, just as issuance of a show-cause order in any criminal case, based on information brought to the attention of the judge, is not . . . a prejudgment of guilt." *Ungar v. Sarafite*, 376 U.S. 575, 586–88 (1964); *see Farrelly v. Timberlane Regional School Dist.*, 114 N.H. 560, 564–65, 324 A.2d 723, 726 (1974).

 The fact that the judge had personal knowledge of disputed evidentiary facts does not necessarily constitute bias. Some of this knowledge was gathered at a meeting between the court and defendants' counsel Lesser just before this incident on August 22, 1976. The judge also candidly admitted that he had gathered information from accounts in newspapers and on the radio. The issues upon which the defendants' claim that the judge should have been available as a witness most likely would not have been material at the trial or evidence thereon could be obtained from other sources.

 The third basis of defendants' claim is that the trial judge became personally embroiled and acted as a prosecutor. This is the type of bias usually engendered in a prior confrontation between the judge and the defendants which causes a personal sting on the court. *Mayberry v. Pennsylvania*, 400 U.S. 455 (1971). There was no such event in this case. In retrospect the trial court might wish that some of its remarks had not been made. However, we cannot hold on the record as a whole that the trial court abused its discretion in refusing to recuse itself or that its refusal deprived the defendants of a hearing before an impartial judge which violated their rights of due process.

VIII. *Right to Call Witnesses.*

 The defendants argue that they were denied the right to call witnesses in their behalf because the trial court refused to grant immunity to, or seal the testimony of, defense witnesses who invoked the fifth amendment. Defendants cite no authority for their position that an order to testify coupled with an offer

to seal the testimony would override one's fifth amendment rights. In effect, defendants ask us to fashion a judicial form of immunity. This we will not do.

Under the immunity presently available, a trial court does not have the power to grant immunity on its own, or to require the government to seek immunity for defense witnesses. RSA 516:34. "Finally, there is no merit to the argument that a defendant has a constitutional right to have immunity conferred upon a defense witness who exercises his privilege against self-incrimination." *United States v. Ramsey*, 503 F.2d 524, 532 (7th Cir. 1974), *cert. denied,* 420 U.S. 932 (1975); *accord, Earl v. United States,* 361 F.2d 531 (D.C. Cir. 1966). It is to be noted that the state did not secure any of its evidence by means of an immunity grant. *United States v. Allstate Mortgage Corp.,* 507 F.2d 492, 494–95 (7th Cir. 1974).

IX. *Sentences.*

The trial court in this case sentenced all ten defendants to the Rockingham County House of Correction for a period of six months, three months suspended. The defendants were released pending appeal. *State v. Riley,* 116 N.H. 529, 363 A.2d 410 (1976); *State v. Adams,* 116 N.H. 529, 363 A.2d 410 (1976). The defendants have asked this court to vacate or reduce their sentences. *Benton v. Dist. Ct.,* 111 N.H. 64, 274 A.2d 876 (1971).

The defendants were all found guilty of the same offense. We held in *State v. Streeter,* 113 N.H. 402, 405, 308 A.2d 535, 537 (1973) that: "A convicted criminal should generally receive the same punishment as another with a like background who has committed the same crime." We are not prepared to substitute our judgment for that of the trial court and hold as a matter of law that the sentences were inappropriate or excessive. *Id.* at 406, 308 A.2d at 538. We notice in the record of sentencing that one defendant requested "work release," RSA 651:19, privileges or "to be incarcerated during weekends or at such times or intervals of time as the court may direct." RSA 651:20. The court denied the motion but stated: "You make such a request in writing to the Court; and at that time the Court will consider it." We are not foreclosing such requests.

*Exceptions overruled.*

Bois, J., did not sit; the others concurred.