Hillsborough
No. 79-216

# THE STATE OF NEW HAMPSHIRE

## v.

## WAYNE J. KELLEY

January 24, 1980

Thomas D. Rath, attorney general (*Peter W. Heed*, assistant attorney general, orally), for the State.

*Cathy J. Green*, of Manchester, by brief and orally, for the defendant.

KING, J.    The defendant was indicted for the offenses of aggravated assault, RSA 631:2 III, and hindering the apprehension of another, RSA 642:3 I(b). A trial by jury resulted in verdicts of guilty on charges of hindering apprehension and of the lesser included offense of simple assault, RSA 631:1.

Prior to trial, the defendant moved to dismiss the hindering apprehension charge based on insufficiency of evidence and also moved to suppress evidence of his three-year-old record of burglary convictions. Both motions were denied. After presentation of the evidence at trial, the defendant moved for directed verdicts on all indictments. These motions were also denied. The defendant seasonably excepted to the court's rulings, and all questions of law were reserved and transferred by the Trial Court (*Cann*, J.).

On the evening of April 28, 1978, the victim, Clark Craig, Sr., chief of the Antrim Police Department, was on routine patrol when a vehicle occupied by two persons passed his patrol car by crossing a double yellow line. After a pursuit at speeds approximating ninety miles an hour, the vehicles stopped at the Antrim-Bennington landfill. As both drivers left their vehicles, Chief Craig recognized the other operator as the defendant. When asked for his registration, the defendant responded: "[I]f you want anything from me, you're going to have to get it." Subsequent testimony adduced during the trial indicated that the motor vehicle was owned by Ernest Kelley, brother of the defendant.

As Chief Craig approached the Kelley vehicle, he was grabbed from behind and thrown to the ground by the defendant's brother, Ernest, the passenger in the Kelley vehicle. The defendant then began

striking the chief with his fists, as did his brother. Ernest Kelley then took the chief's revolver, struck him with the gun and fired three shots in his direction. Before leaving the scene, the defendant told Chief Craig that if he ever reported this incident, the defendant would "take care" of both Craig and Craig's wife. Later that evening a State trooper observed the Kelley vehicle and forced it off the road. The defendant attempted to flee, but was apprehended.

The first issue is whether there was sufficient evidence before the jury to convict the defendant of hindering the apprehension of his brother. The defendant argues that the jury could not conclude that he was operating the vehicle because no direct evidence was presented that he drove the vehicle from the scene of the assault.

A fact, however, may be proved by circumstantial evidence. Circumstantial evidence consists of proof of facts or circumstances which give rise to a reasonable inference of the truth of the fact sought to be proved. *State v. Canney*, 112 N.H. 301, 294 A.2d 382 (1972). It is well established that circumstantial evidence may be sufficient to warrant the finding by a jury of guilt beyond a reasonable doubt. *State v. Palumbo*, 113 N.H. 329, 306 A.2d 793 (1973). The law makes no distinction between direct evidence of a fact and evidence of circumstances from which the existence of a fact may be inferred.

The evidence here indicates that the defendant was driving the vehicle when stopped by Chief Craig, that the defendant went to the driver's side of the car upon leaving the scene of the assault, and that he was driving the vehicle later that evening when he was apprehended by the State trooper. We conclude, therefore, that the jury could properly draw the inference that the defendant was the driver of the vehicle when he left the scene of the assault. *See State v. Taylor*, 118 N.H. 855, 395 A.2d 1239 (1978).

The defendant next argues that it was error for the jury to consider evidence of the defendant's subsequent operation of the automobile in Antrim because the defendant was indicted for hindering the apprehension of Ernest Kelley "by driving him from the scene of the theft," an event which, if it occurred at all, took place in Bennington. The defendant asserts that consideration of the Antrim incident should not be allowed because it was not raised in the indictment, thus denying him an opportunity to prepare an adequate defense. The evidence of driving in Antrim after the incident, like the evidence of his driving before the incident, is simply circumstantial evidence which coupled with the fact that he went to the driver's side of the car supplies sufficient evidence for a finding that he drove the car from the scene in Bennington.

The defendant argues that even if the jury found that he was operating the vehicle, the State failed to prove beyond a reasonable doubt an element of the offense, namely, his intent to commit the crime charged. The defendant contends that rather than intending to hinder the apprehension of his brother, he was fleeing to prevent his own apprehension.

RSA 642:3, which defines the offense of hindering apprehension, was drafted from the MODEL PENAL CODE, § 242.3. Under that provision, the State must prove that the defendant's purpose was to hinder apprehension, prosecution or conviction. MODEL PENAL CODE, § 242.3 (Tent. Draft No. 9, at 196–97 (1959)). This need not, however, be the defendant's sole intent. In the *Comments* to § 208.32 of Tentative Draft No. 9, the drafters of the Code recognized, for example, that a person may give personal relief (in the form of food or money), not with the intent of impeding law enforcement, but rather with the motive of sustaining the fugitive. Significantly the draftsmen declared, "[w]e prefer to recognize that motivations may be mixed, and to permit conviction where the obstructive purpose was present." *Id.* at 197–98.

■ It is likely that the defendant wanted to flee from the scene of his assault upon Chief Craig. It is also reasonable that he did not want to see his brother apprehended, and thus intended to transport his brother from the scene as well. We held that because the statute allows such a mixture of motivations, and because the jury could reasonably find from the evidence presented that an obstructive purpose was present here, the conviction was proper.

The second issue is whether the trial court abused its discretion by ruling that the defendant's prior criminal convictions were admissible to impeach him if he chose to testify in his own behalf. Following well-settled law in this State, the trial justice denied the defendant's motion to suppress his three-year-old burglary convictions. *See State v. Lavallee,* 119 N.H. 207, 400 A.2d 480 (1979); *State v. Cote,* 108 N.H. 290, 294–95, 235 A.2d 111, 114 (1967), *cert. denied,* 390 U.S. 1025 (1968); *State v. Duke,* 100 N.H. 292, 123 A.2d 745 (1956).

The defendant argues that in determining the admissibility of a defendant's prior criminal convictions to impeach his credibility, the court must draw a distinction between pleas of guilty and pleas of not guilty which resulted in verdicts of guilty. The defendant reasons that adjudications of guilt after denial of guilt may properly be used for impeachment because they are indicative of a defendant's lack of veracity, whereas convictions based on admitted guilt reveal a willingness to tell the truth. Consequently, convictions based on guilty pleas should not be used for impeachment purposes. The defendant

18

asserts, therefore, that because he entered pleas of guilty to the charges of burglary in 1975, and in so doing did not lie to a court or to a jury, his record of prior convictions should not be admitted for impeachment purposes.

■ We find'no merit in a distinction that would have this court close its eyes to the reality that many defendants who know they have committed crimes plead guilty simply in exchange for a less severe penalty arranged by plea bargaining. It is not necessarily a matter of truthfulness; it is often a matter of negotiating for a lesser sentence. *See North Carolina v. Alford*, 400 U.S. 25, 37 (1970).

■ If the defendant here had elected to testify, his credibility, like that of any other witness, could have been impeached by evidence of prior criminal convictions. *State v. Lavallee supra*; *State v. Cote supra*. He was confronted with a choice whether to testify and subject himself to impeachment or to withhold his testimony and allow his version to remain untold. He chose the latter course.

■ The defendant asserts that the trial court's ruling effectively "chilled" his constitutional right to testify in his own behalf. The defendant acknowledges that admission of a prior criminal conviction for impeachment is sanctioned by RSA 516:33 and, in the past, has consistently withstood constitutional attack. *State v. Lavallee supra*; *State v. Cote supra*. The defendant, however, would have this court overturn this rule on the ground that the admission of prior convictions solely for impeachment purposes constitutes a denial of the defendant's right to due process of law as guaranteed by part 1, article 15 of the New Hampshire Constitution and the fifth and fourteenth amendments to the United States Constitution. *See State v. Santiago*, 53 Haw. 254, 492 P.2d 657 (1971). *But see Lowell v. State*, 574 P.2d 1281 (Alaska 1978); *Burrell v. State*, 399 A.2d 1354, 1366-67 (Md. App. 1979); *Coats v. State*, 589 P.2d 689, 697 (Okla. App. 1979).

■ The defendant argues that the use of prior convictions for impeachment constitutes an impermissible burden upon his right to testify in his own behalf. This claim is analogous to that rejected in *Brown v. United States*, 356 U.S. 148, 155-56 (1958):

> [The defendant] has the choice, after weighing the advantage of the privilege against self-incrimination against the advantage of putting forward his version of facts and his reliability as a witness, not to testify at all. He cannot reasonably claim that the Fifth Amendment gives him not only this choice but, if he elects to testify, an immunity from cross-examination on the matters he has himself put in dispute. It would make the Fifth

> Amendment not only a humane safeguard against judicially coerced self-disclosure, but a positive invitation to mutilate the truth a party offers to tell.

*Id.* Similarly, it is not inconsistent with a defendant's right to testify that the prosecution is allowed to impeach the defendant with a statement obtained from him in violation of *Miranda v. Arizona,* 384 U.S. 436 (1966). *Harris v. New York,* 401 U.S. 222 (1971); *cf. Mincey v. Arizona,* 437 U.S. 385 (1979). Although defendant in this situation must often choose between two unpleasant alternatives, such a dilemma is not thought to violate due process. *See, e.g., State v. Ruzicka,* 89 Wash. 2d 217, 233–34, 570 P.2d 1208, 1216 (1977); *cf. Middendorf v. Henry,* 425 U.S. 25 (1976).

> The object of a trial is not solely to surround an accused with legal safeguards but also to discover the truth. What a person is often determines whether he should be believed. When a defendant voluntarily testifies in a criminal case, he asks the jury to accept his word. No sufficient reason appears why the jury should not be informed what sort of person is asking them to take his word. In transactions of everyday life this is probably the first thing that they would wish to know. . . . Lack of trustworthiness may be evinced by his abiding and repeated contempt for laws which he is legally and morally bound to obey . . . though the violations are not concerned solely with crimes involving "dishonesty and false statement."

*State v. Cote,* 108 N.H. at 296, 235 A.2d at 115.

A rule barring the use of convictions for crimes not involving truth-telling would grant the defendant an unfair advantage. He would be able to testify knowing that although he had been convicted of several crimes, the jury would be left with the impression that the defendant had led a life free from crime. This unfairness is intensified when prior convictions of prosecution witnesses are used to affect their credibility. The fact that the defendant in this case has committed two burglaries certainly bears on his honesty.

RSA 516:33 does not limit the use of prior convictions to those involving infamous crimes. The purpose of that statute is to remove the testimonial disqualification of a felon while at the same time making it clear that the prosecution would not be prevented from using evidence of his conviction for impeachment purposes. *State v. Archer,* 54 N.H. 465 (1874). There is nothing which indicates that RSA 516:33 was intended to limit the kind of prior convictions which could be so used.

■ We are satisfied that properly instructed, the jury will not use the prior convictions for an improper purpose. The proper exercise of discretion by the trial court will bar the use of prior convictions that would cause undue prejudice. *See State v. Mann*, 112 N.H. 412, 297 A.2d 664 (1972).

We reaffirm our prior cases and hold that the trial judge in this case did not abuse his discretion in ruling that if the defendant chose to testify, the State could introduce his three-year-old burglary convictions.

*Exceptions overruled; appeal dismissed.*

DOUGLAS, J., dissented; the others concurred.

DOUGLAS, J., dissenting.

This court declines to discard an outmoded rule of law by not imposing more stringent limitations on the use of prior convictions to attack credibility. In light of recent initiatives by the federal system and various state courts, I am compelled to reexamine the posture of this court.

Since the enactment of RSA 516:33, which permits the admission of evidence of certain prior crimes for impeachment purposes, this court has held that the use of such evidence was subject only to "the close control of the Trial Court in the exercise of its discretionary powers." *State v. Cote*, 108 N.H. 290, 297, 235 A.2d 111, 116 (1967); *see generally State v. Lavallee*, 119 N.H. 207, 400 A.2d 480 (1979). Although RSA 516:33 refers only to "infamous crimes," in practice this has been liberally construed to justify admission of all crimes except misdemeanors. *State v. Cote supra; see State v. Travis*, 82 N.H. 220, 131 A. 598 (1926). Such a standardless policy places many criminal defendants in a difficult situation.

Due process includes the right of an accused to testify in his own behalf. *In re Oliver*, 333 U.S. 257 (1948). For those criminal defendants with prior records, the possibility that past convictions will be used to impeach credibility and that undue prejudice might result is a major concern in the decision whether or not to take the stand.

> The accused, who has a "record" but who thinks he has a defense to the present charge, is thus placed in a grievous dilemma. If he stays off the stand, his silence alone will prompt the jury to believe him guilty. If he elects to testify, his "record" becomes provable to impeach him, and this again is likely to doom his defense. Where does the balance of justice lie?

MCCORMACK, EVIDENCE § 43 (2d ed. 1972).

If the accused testifies and his prior record is divulged, the jury

might draw what Justice Stevens once referred to as the legally impermissible inference that the defendant "is more likely to have committed the offense for which he is being tried than if he had led a blameless life." *See United States v. Harding*, 525 F.2d 84, 89 (7th Cir. 1975). *See generally* I WIGMORE, EVIDENCE § 57 (3d ed. 1940). The effect of this impermissible inference on the jury was extensively studied by Kalven and Zeisel in an authoritative study of the American jury system. The study revealed that when the prosecutor's evidence contained contradictions favoring the defendant, the acquittal rate for those with no record was 65%. This compared with an acquittal rate of only 38% when the same evidentiary contradictions existed, but the defendant either had a record or failed to testify. KALVEN AND ZEISEL, THE AMERICAN JURY 160 (1966). This is significant because 47% of all defendants studied had prior records. *Id.* at 145. Statistical evidence and common sense support the conclusion that the possibility of prejudice from admission of a prior record has a "chilling effect" on defendants who might otherwise take the stand. When the evidence strongly favored the defendants, those with a record testified 53% of the time; those without a record took the stand 90% of the time. *Id.* at 146.

Some defendants elect to bring out the prior record on direct examination in a tactical effort to soften its impact. Regardless of how the evidence gets in, however, the impact on the jury is substantial. Other studies have confirmed that jurors fail to utilize impeachment evidence merely in assessing credibility; rather they tend to regard it as an indication that the defendant's guilt is more likely because he has been guilty in the past. *See* Comment, *Other Crimes Evidence At Trial: Of Balancing and Other Matters*, 70 YALE L.J. 763, 777 (1961).

Although clearly recognizing "that prior convictions have an inherent prejudicial effect," this court continues to rely on the "discretion" of the trial court and the curative effect of limiting instructions. *State v. Lavallee*, 119 N.H. 207, 400 A.2d at 483 (1979); *State v. Black*, 116 N.H. 836, 837, 368 A.2d 1177, 1178 (1976), *cert. denied*, 431 U.S. 906 (1977). Instructing the jury to disregard a prior record when assessing guilt is similar to the experience writer Leo Tolstoy described when as a boy he was asked to stand in a corner for five minutes and *not* think about a white bear. Of course, such a feat of psychological wizardry cannot be done. Jeans, TRIAL ADVOCACY, p. 237 (1975). As the Supreme Court stated in *Bruton v. United States*, 391 U.S. 123 (1968): "[T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." *Id.* at 135.

Responding to cries for reform at the federal level, Congress

enacted Rule 609 of the Federal Rules of Evidence, which admits only crimes of "dishonesty or false statement," or felonies where the probative value outweighs any possible prejudice. Rule 609 also imposes a remoteness limitation of ten years on the use of crimes for impeachment purposes.

Reform is also taking place at the state court level. The Iowa Supreme Court has ruled that evidence of a prior conviction is admissible to attack credibility only if the conviction involves "dishonesty or false statement," and the judge finds that probative value outweighs prejudicial effects. *See State v. Martin*, 217 N.W.2d 536, 542 (Iowa 1974). That court also indicated that decisions on the admissibility of the prior crimes should be made at pretrial hearings. *Id.* at 543.

The Supreme Court of Alaska adopted a rule of procedure similar to that required by the Iowa Supreme Court holding in *Martin*. In addition, the Alaska court placed a remoteness limitation of five years on the use of any prior crime for impeachment purposes. *See Lowell v. State*, 574 P.2d 1281 (Alaska Sup. Ct. 1978).

Labeling the use of prior crimes to impeach the accused, "a remnant from a barbaric past," the West Virginia Supreme Court of Appeals recently held that except for convictions involving perjury or false swearing, evidence of prior crimes was inadmissible to impeach the defendant. *See State v. McAboy*, 236 S.E.2d 131 (W.Va. Sup. Ct. App. 1977).

The Hawaii Supreme Court in *State v. Santiago*, 53 Haw. 254, 492 P.2d 657 (1971) decided totally to bar admission of all evidence of prior crimes to impeach a defendant regardless of probative value. Basing the decision on due process grounds, the court held "that to convict a criminal defendant where prior crimes have been introduced to impeach his credibility as a witness violates the accused's constitutional right to testify in his own defense." *Id.* at 53 Haw. 260, 492 P.2d 661. To my knowledge, this was the first state to bar the impeachment use of prior crimes on such a broad constitutional footing.

Although I would not go as far as the Hawaii court in *Santiago*, I am convinced that *Cote* is out of step with current legal thinking and with the reality of the jury system and human nature. I prefer to chart a middle course. I believe that the "balance of justice" allows the admission of only those prior felonies that bear on the defendant's truth-telling ability. *See State v. Lavallee supra (Douglas*, J. concurring). This would encompass such crimes as false swearing, perjury, criminal fraud, embezzlement, false pretense or any other felony probative of the accused's ability to tell the truth. Crimes of violence would be inadmissible; I see no rational relationship between

violent behavior and truth-telling. Murder and assault may evince a vicious disposition but they are not necessarily indicative of dishonesty. *See* Ladd, *Credibility Tests—Current Trends*, 89 U. PA. L.R. 166, 178 (1940). *See generally* 3A WIGMORE § 926 (Chadbourne rev.).

Such a policy does not deprive the prosecutor of his right to resort to careful cross-examination and to use prior inconsistent statements to challenge a defendant's credibility. Nor is the jury precluded from using the defendant's witness-stand demeanor to help it assess credibility. Most importantly, because it has not already inferred guilt from a prior record, the jury more carefully scrutinizes the accused's testimony. The benefit derived from the defendant's testimony concerning his version of the facts far outweighs any State interest of which I am aware. Of course, prior conviction would be permitted for impeachment if a defendant voluntarily asserted that he had no prior record when he in fact did.

Once a prior crime is determined to be probative of the defendant's veracity, the next inquiry centers on remoteness. Presently, the determination of remoteness is left to the discretion of the trial court. *State v. Cote*, 108 N.H. at 297, 235 A.2d at 116; *State v. Duke*, 100 N.H. at 294, 123 A.2d at 745. As a result, defendants have few guidelines in assessing the possibility of the admission of past crimes. For example, in *Cote*, a 15-year-old conviction for breaking and entering and larceny was admitted over defense objection. Such a practice fails to recognize that "old convictions are not a meaningful index of a propensity to lie." *See United States v. Puco*, 453 F.2d 539, 543 (2d Cir. 1971). This also might prejudice the defendant who aside from a single transgression committed years ago may have a blemish-free record. While a circuit judge, Chief Justice Burger addressed the issue of remoteness in *Gordon v. United States*, 383 F.2d 936, 941 (D.C. Cir. 1967), *cert. denied*, 390 U.S. 1029 (1968). There he stated that "[t]he nearness or remoteness of the prior conviction is also a factor of no small importance. Even one involving fraud or stealing, for example, if it occurred long before and has been followed by a legally blameless life, should generally be excluded on the ground of remoteness." *Id.* at 940.

I note that the New Hampshire Legislature has chosen five years as an indication of remoteness for prior offenses under both RSA 318-B:4 III (Supp. 1977), the Controlled Drug Act, and RSA 262-B:2 I, the Habitual Offender Statute. For DWI convictions, the legislature chose seven years as an indication of remoteness. RSA 262-A:62. These statutory limits are instructive concerning the legislature's view as to when a prior crime becomes too remote. Accordingly, I would admit no crimes, whether or not indicative of veracity, to impeach the defendant if the crime was more than seven years old.

Further, no prior crime evidence should be admitted unless the state files a motion containing specific, underlying facts indicative of the conviction's relationship to the defendant's veracity. A pretrial hearing *in limine* should then be held in which the court should make specific, *on the record findings* regarding admissibility. *See* Superior Court Rule 68. This should facilitate appellate review. The First Circuit Court of Appeals recently approved of such pretrial hearings because they enable the accused to make a more informed decision on whether to testify. *See United States v. Oakes,* 565 F.2d 170, 171–72 (1st Cir. 1977); *State v. Bennett,* 405 A.2d 1181 (R.I. Sup. Ct. 1979).

Though I agree that one object of a trial is "to discover the truth," this inquiry must not be so open-ended that the defendant is subjected to undue prejudice. "Where viable alternatives do exist, it is deceptive to rely on the pursuit of the truth to defend a clearly harmful practice." *Bruton v. United States supra* at 134. The rules of evidence, and especially the hearsay rule, are meant to deny certain "truths" to the jury, not because they weren't heard, but because the testimony may be unreliable. "The Continental system has no such restraints. The witness takes the stand, recites his name and everything he wishes about the matter at hand." Jeans, TRIAL ADVOCACY, p. 212 (1975). Generally one's juvenile or school records are not admitted. Thus the "truth" is, to that extent, withheld from the jury. Even a polygraph examination directly relevant to the defendant's credibility was recently barred by this court (over my dissent), thereby limiting the jury's access to the total "truth" concerning a defendant. *See State v. French,* 119 N.H. 500, 403 A.2d 424 (1979).

Accordingly, on due process grounds I would reverse and remand this case for a new trial because of the potential use of defendant's two prior burglary convictions that deterred him from testifying as to his version of the incident.