Angela Burton was indicted for and convicted of hindering prosecution in the first degree, a violation of § 13A-10-43, Code of Alabama 1975. Burton's conviction stems from her actions in allegedly rendering criminal assistance to Felicia Scott and Frederic Polion following the murder of Carethia Curry. Scott and Burton are sisters. Polion was Scott's boyfriend and lived with her. He was also alleged to be the father of the child that he and Scott claimed as their child.
Seventeen-year-old Curry was murdered on or about January 31, 1996. She was nine months' pregnant. Forensic examinations suggest that Curry was alive when her unborn child was cut from her womb and she was then shot two times in the head with .25 caliber bullets. Scott was *Page 876 
convicted of Curry's murder, made capital because it occurred during a kidnapping in the first degree, and Polion was convicted of first degree kidnapping.
The indictment against Burton charged that, by means of deception, she prevented or obstructed law enforcement officials from discovering Carethia Curry's body. The discovery of the body might have aided in the discovery or apprehension of Felicia Scott and Frederic Polion, who were wanted in connection with Curry's disappearance and murder. The jury found Burton guilty of hindering prosecution as charged in the indictment and she was sentenced to 17 years' imprisonment. Additionally, her probation on a prior conviction concerning forged checks was revoked.
The central issue before this court is whether the evidence was sufficient to sustain a conviction for hindering the prosecution in the first degree. Because this case presents difficult evidentiary questions, a detailed rendition of the facts is required. A synopsis of the testimony of the most crucial witnesses follows.
Carolyn O'Neal is Carethia Curry's mother. She gave the following testimony at trial. Curry was nine months pregnant on January 31, 1996, and was living at O'Neal's home in Tuscaloosa. O'Neal and Curry knew Scott and Burton. In fact, they had both babysat Burton's children. On January 31, 1996, Scott drove to O'Neal's house and picked up O'Neal and Curry to go shopping. The three women drove to Eutaw looking for baby clothes. Afterwards, Scott returned O'Neal and Curry to their home, but told them she would come back and get them again after she had taken Polion to cash his paycheck. Scott returned as she said she would, and the three women went to the Family Dollar Store discount store to look for baby clothes. Afterwards, the three women went to Scott's apartment in Tuscaloosa. They were eating cake when Anthony Rowser and Burton arrived with Burton's five children. Burton lived in Birmingham at the time. Rowser came to the door but he did not come in. Burton was not friendly and did not speak because, according to O'Neal, she and Rowser were "fussing at the time." R. 247. There was some discussion between Scott and Curry about their getting pizza for supper and Scott announced that "us two pregnant women [were] going to eat pizza." R. 247. Although this reference to pregnancy included both Scott and Curry. O'Neal said that she knew Scott had had a hysterectomy and could not have any more children. O'Neal testified that on previous occasions Scott had represented that she was pregnant. Scott had two children. O'Neal stated that Burton did not say anything in response to the comment about eating pizza.
Scott took O'Neal and Curry to their home when she picked up her son from school. Scott telephoned Curry about 5:00 p.m. to ask if Curry still wanted to get pizza. Scott came and got Curry at about 6:00 p.m. on January 31, 1996. Curry never returned home.
O'Neal telephoned Scott's apartment about 2:00 a.m., February 1, 1996, and Polion answered. O'Neal asked him where Curry was. Polion told her that he did not know. Scott telephoned O'Neal at around five or six that morning and told O'Neal that she had dropped Curry off at home at around 8:30 p.m. Nevertheless, O'Neal said she asked Scott what she had done with Curry. Scott did not answer O'Neal, but stated instead that she had been in Birmingham having her baby and that she had been sent home because she did not have insurance. According to O'Neal, at that time she telephoned the police and reported that Scott and Polion had kidnapped her daughter. The following Monday, February 5, 1996, O'Neal discovered *Page 877 
that Scott had actually "come back home with a baby." R. 256. On February 5, 1996, O'Neal telephoned the police and told them that she believed that Scott had Curry's baby and that Curry was still missing.
Jerry Davis testified that he lived five or six miles outside Tuscaloosa in an area known as King Acres. According to Davis, Scott was a close friend. He testified that on February 1, 1996, he arrived home from work between 5:00 a.m. and 5:30 a.m. He said that Scott and Polion were in their car "backed up in the yard" and they were beginning to drive out of the yard as he drove up. R. 263. As they passed, Polion rolled down his window a little and stated that they were in a hurry because he had to get home and get ready for work. Davis said that it was odd for anyone to be at his home at that hour, but that because it was Scott and Polion he did not let it worry him. Davis stated that there is a septic tank in his yard that consists of a big hole covered with boards.
Constance Swift testified that on February 1, 1996, she lived in the Wylam section of Birmingham next door to Burton. She testified that some months before February 1, 1996, she had been shopping with Burton when Burton purchased a set of "New Kids on the Block"[1] sheets. On Wednesday, January 31, 1996, Burton asked Mrs. Swift if she would take her children to Lloyd Noland Hospital, but Mrs. Swift was unable to help Burton that day.
Between 7:00 a.m. and 7:15 a.m., on February 1, 1996, Mrs. Swift saw Scott's white Nissan Altima automobile parked at Burton's home. Mrs. Swift testified that on Thursday, February 1, 1996, it was very cold, and on Friday, February 2, 1996, it snowed. She testified that she believed that on February 3, 1996, Burton telephoned her and asked for the telephone number of the wrecker service she and her husband used. Mrs. Swift stated that, later that same day, between 11:00 a.m. and 12:30 p.m., after hearing a noise, she looked out her window and saw Scott standing in Burton's backyard.
Elbert T. Swift, Jr., is Constance Swift's husband and Burton's neighbor. He testified that he was taking his trash out between 6:30 a.m. and 7:00 a.m., on February 1, 1996, when a white Nissan Altima pulled into Burton's driveway. A man and a little boy got out and went to Burton's door. A woman was in the back seat. He stated that the last time he saw this car was the day it snowed (Friday, February 2, 1996). At that time the car was stuck in Burton's backyard because the front wheels had slid off the driveway.
Arrissa Walker is the daughter of Elbert and Constance Swift. She testified that the "New Kids on the Block" bedsheets were purchased in the fall of 1995. She testified that she remembered seeing one of these sheets lying on the ground in Burton's yard during the ice storm.
Nico Cunningham was a cashier at a Food Giant grocery store in Bessemer on February 1, 1996. She testified that on February 1, 1996, someone purchased duct tape and rope. She stated that she remembered this transaction because it was the first time that anyone had purchased these two items at the same time. The sales receipt reflected that the purchase was made at 9:24 p.m. When Cunningham was interviewed by the police, she picked Scott out of a photographic lineup as the woman who had purchased the rope and the duct tape. She later identified Polion as the man who was with Scott at that time. Cunningham stated that she knew who Burton was because she was a customer at the Food Giant. She said that *Page 878 
Burton was not with Scott and Polion during the purchase.
Kenneth Dean Harris testified that on February 2, 1996, he was employed as a driver by B and W Wrecker Service. On that date he was sent to Burton's home to pull a white Nissan Altima automobile back onto the driveway. The front end of the car had gone off a drop off in the backyard and was stuck. When he arrived he spoke with Polion. He also stated that he saw a female but that he could not identify her. Polion told Harris that the night before he had pulled into the backyard to turn around and had slid off the driveway. Polion paid Harris in cash and signed the receipt. The date on the receipt is February 2, 1996, but no time was noted on the receipt.
Harris stated that he noticed a garbage can sitting out on the righthand side of Burton's garage. Burton's garage is in the backyard, detached from her house. He described the can as a dark colored, 45- to 50-gallon roll-around, with two wheels, a handle, and grey duct tape around the top. Harris stated that almost a year had passed before he spoke to police officers about this incident. In his first statement to police, which would have been in the spring of 1997, Harris did not state that there was duct tape on the garbage can he saw next to Burton's garage. Harris stated that his memory was presently better than before, and he was sure he saw duct tape on the garbage can at Burton's. Additionally, Harris testified in a December 1997 proceeding that he saw duct tape on the garbage can by Burton's garage.
Toni Everett was an officer in the juvenile division of the Tuscaloosa Police Department at the time Carethia Curry was reported missing. Everett testified that on February 1, 1996, she received an incident report from O'Neal stating that Curry was missing. The following Monday, February 5, 1996, Everett received a telephone call from O'Neal informing her that Felicia Scott had a new baby and O'Neal thought that the baby was Curry's baby and that Curry was still missing.
On February 5, 1996, Everett went to Felicia Scott and Frederic Polion's residence. She discovered a newborn infant. She asked if the baby belonged to Carethia Curry and was told by Scott and Polion that the baby was their child. An investigation of Felicia Scott's medical records disclosed that she had not received any prenatal care as she told Everett she had, and that she had previously had a hysterectomy and was unable to bear children. After receiving this medical information, Everett returned to Scott and Polion's home. However, the baby, Scott and Polion could not be found.
Everett stated that she first contacted to Angela Burton on February 7, 1996, at Burton's mother's home. At that time, according to Everett, the authorities were looking for Curry, a baby, and Scott. According to Everett, there was not necessarily a criminal investigation underway at that point; the police were simply attempting to determine the whereabouts of these people. Everett took Burton to the juvenile office and took a written statement from her regarding what she knew of Curry's disappearance. Burton was not a suspect in any crime at that time. Everett stated that she asked Burton where Scott was. Burton told Everett that the previous Thursday, (February 1, 1996), "her sister, Frederic [Polion], Felicia's two boys and the new baby had come to her house in Wylam, Jefferson County, at about eleven o'clock that morning." R. 411. Burton stated that the family left the next day and she did not know where Scott was at the present time.
The baby, Scott, and Polion were located on February 8, 1996, in Gwinett County, *Page 879 
Georgia, a suburb of Atlanta. Scott was arrested in Georgia and was charged with interference with custody. According to Everett, the homicide unit essentially took over the investigation after this.
Michael Hearing, a homicide investigator for the Tuscaloosa Police Department, testified that on February 5, 1996, after Officer Everett had spoken to Scott, he was asked by his supervisor to take over the investigation because the police "were thinking that this might lead to more than just a missing person." R. 518. Hearing stated that his investigation led him to Burton's home because he learned that Scott and Polion had gone to Burton's house on February 1, 1996.
Hearing testified that he first spoke to Burton when she gave a statement to Everett on February 7, 1996, and again on February 10, 1996, about Curry's disappearance and the newborn baby that Scott had with her. Burton was not a suspect in a crime. Hearing hoped that Burton could provide information that would lead to the recovery of Curry and what might be her baby.
Hearing stated that on February 10, 1996, he asked Burton what time Scott and Polion arrived at her home on February 1, 1996. She told him 2:00 a.m. or 3:00 a.m. in the morning. He remembered that Burton had previously told Everett that they arrived between 11:00 a.m. and noon. Hearing stated that he asked Burton where Curry was (R. 524) and Burton did not tell him. R. 526. However, Hearing testified that he had no knowledge that Burton knew that Curry had been killed or where the body was. R. 592-93.
Charles Dennis Drapper testified that on March 14, 1996, he discovered a 20- or 30-gallon dark-colored garbage can, with wheels, wrapped with duct tape, containing a human body, in a ravine 2.5 miles from Angela Burton's home in the Pleasant Grove area of Birmingham. The body was identified as that of Carethia Curry. Curry's body was wrapped in Burton's "New Kids on the Block" bedsheet. It was later discovered that Curry's womb had been cut open and a baby removed and that she had been shot two times in the head with a .25 caliber weapon. Subsequently, Polion lead officers to other evidence related to the murder located .2 mile from where the body was found. This evidence included a pamphlet on high-risk pregnancy that showed how the cuts of a cesarean section were to be made, a single-edge razor blade, razor blade covers, and a pair of latex gloves.
Hearing stated that because the garbage can containing Curry's body looked new, police officers went through nearby neighborhoods and discovered that most people in that area shopped at the Wal-Mart discount store in Fairfield. That store is approximately 8 to 10 miles from Burton's house. Upon investigation of the receipt tapes kept at that Wal-Mart store, he discovered that a 45-gallon garbage can was purchased on February 1, 1996, at 4:00 p.m. By matching the bar codes, it was determined that this can was the garbage can containing Curry's body.
Hearing testified that during the investigation Burton moved from her home in Wylam to her mother's home in Tuscaloosa. Burton's belongings were placed in a storage facility. On March 25, 1996, police conducted a search of the storage facility. An incomplete set of "New Kids on the Block" sheets was discovered. It was later discovered that these sheets matched the sheet in which Curry's body was wrapped.
Hearing testified that Burton's telephone records were obtained in late April 1996. On February 10, 1996, Burton alleged that during the early morning of February 1, 1996, she had telephoned several hospitals in the Birmingham area *Page 880 
looking for Scott. Her telephone records did not reflect that these telephone calls were made. She also stated that Polion had called her several times from his home during the early morning hours of February 1, 1996, looking for Scott. Polion's telephone records did not disclose that these calls were made.
The telephone records disclosed that from January 31, 1995, through February 3, 1996, 24 outgoing calls were made from Burton's telephone to Lee Curtis Turner. Based on this information Hearing decided to talk to Turner. Hearing's conversation with Turner occurred in late April 1996. (The exact date is not in the record.) Burton was arrested the next day.
Turner, Burton's ex-boyfriend, provided Hearing with a account of information allegedly told to him by Burton about Carethia Curry and her baby. Turner's testimony was essentially as follows.
On February 1, 1996, at approximately 10:00 p.m., Burton telephoned Turner and pleaded with him to come over to her house because she said she needed to talk to him. He arrived at approximately 10:15 p.m., and Burton showed him a baby that she said was Scott and Polion's, but he stated that he never saw Scott or Polion. However, their car was parked outside Burton's home and he heard voices in the back bedrooms of the house. Burton and Turner left in his car to ride around and talk. At this time Burton told Turner that Scott and Polion had arrived unexpectedly at Burton's home on February 1, 1996, with a newborn baby who they said was theirs. Turner stated that Burton had told him on a couple of occasions before this incident that Scott could no longer have children due to some medical procedure she had undergone and that assertions Scott was making at that time about being pregnant were untrue.
According to Turner, Burton stated that earlier in the day Burton had seen Scott digging a hole in her backyard. Burton said that Scott told her that she needed Burton's help to hide a body. At first, according to Burton, Scott stated that she had killed someone who had tried to rape her and that she had panicked and put the body in the car and she was now afraid to involve the police. Burton stated that she thought Scott was joking and asked to see the body. Scott opened the trunk of her automobile and Burton saw Carethia's body. Burton told Turner that Carethia's stomach had been cut wide open and that Scott and Polion had removed Curry's baby by cesarean section. Burton was very upset and stated that she did not understand why Scott brought this trouble to her house because Burton was on probation. Burton told Turner that she did not want to be involved in any trouble because she did not want to lose her family again. At the end of their discussion, Turner said that he thought he had persuaded Burton to telephone the police and tell them what had happened and he believed that she would. Turner stated that he telephoned about 7:00 a.m., on February 2, 1996, and Burton told to him she had to get off the telephone because the police had just pulled up. Turner stated that he assumed everything was going to be taken care and be all right for Burton. He later learned that Scott was not arrested until some time later in Georgia. Burton told Turner that the police had been holding Scott in Bryce Hospital, a state-owned psychiatric hospital, but that she had escaped and gone to Georgia. Later, after Turner had been contacted by Hearing, he spoke to Burton about the situation. Burton asked him not to tell the police anything other than that he had seen a baby but he did not know whose baby it was. She told him that if he gave any more information to the police he would be putting her in serious jeopardy. *Page 881 
The defense challenged Turner's credibility on cross-examination by showing that he had had a bad relationship with Burton and a boyfriend, Anthony Rowser.
On approximately December 18, 1996, Anthony Rowser gave a statement to the police. Anthony Rowser was Burton's ex-boyfriend and the father of two of her children. During the trial on the current charge, Rowser's testimony was impeached by the admission of his testimony from Burton's probation revocation proceedings. At the probation revocation proceedings Rowser testified that Burton told him that she knew Scott could not have children, that Scott had killed Curry at Scott's apartment, and that Scott had bought a garbage can to dispose of the body. At the trial on the current charge, Rowser essentially recanted his testimony from the probation revocation hearing. He explained that he had lied because Burton had had him arrested for harassment and he was furious with her. In retaliation for his being arrested for harassment he called Detective Steele[2]
and gave him a statement based on newspaper reports and information that he had heard on the street about Curry's murder. Later, Steele told him that if he changed his story he would be convicted of perjury, so he lied at the probation revocation proceedings.
The defense presented testimony showing the bad relationship between Rowser, Turner, and Burton shortly before Curry's death, as possible motives for why Rowser and Turner would lie about Burton's involvement in the murder.
Mike Sullivan testified that he was working in the Tuscaloosa County District Attorney's office in February 1996. He stated that he was in charge of the grand jury investigation into the disappearance of Carethia Curry. The specific case docketed for consideration by the grand jury was the charge against Scott for interference with parental custody. However, as a result of evidence gleaned through the investigatory process, Scott was ultimately indicted for capital murder. He stated that Burton was subpoenaed, placed under oath, and testified as a witness before the grand jury. He testified that Burton never mentioned Lee Turner during her testimony. Burton testified that on the night of January 31 and morning of February 1, 1996, Polion had telephoned her approximately eight times asking her to check hospitals in Birmingham for Scott. She stated that his last call to her was at 12:48 a.m. on February 1, 1996. She stated that she telephoned University of Alabama Hospital, Lloyd Noland Hospital, and Children's Hospital searching for Scott. Burton's telephone records did not reflect that calls were made to hospitals on January 31 or February 1. R. 575. Polion's telephone records did not reflect a telephone call to Burton. R. 574. According to Sullivan, Burton never disclosed Curry's whereabouts during her entire grand jury testimony.
 I.
Burton contends that the trial court erred in denying her motion for a judgment of acquittal. The motion was based on the ground that the State had failed to establish a prima facie case of hindering prosecution, as charged in the indictment.
 "`In reviewing the action of the trial court in overruling a motion to exclude the evidence, only the evidence before the trial court at the time the motion was made can be considered. . . . The standard of review is whether there exists legal evidence before the jury, at the time the motion was made, from which *Page 882 
the jury could by fair inference find the defendant guilty.'"
Gainer v. State, 553 So.2d 673, 678 (Ala.Cr.App. 1989) (quotingThomas v. State, 363 So.2d 1020, 1022 (Ala.Cr.App. 1978)).
 "`In determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution. . . .' It is not the function of this Court to decide whether the evidence is believable beyond a reasonable doubt . . .; rather, the function of this Court is to determine whether there is legal evidence from which a rational finder of fact could have, by fair inference, found the defendant guilty beyond a reasonable doubt. . . . Thus, `[t]he role of appellate courts is not to say what the facts are. [Their role] is to judge whether the evidence is legally sufficient to allow submission of an issue for decision [by] the jury.'"
Ex parte Woodall, 730 So.2d 652, (Ala. 1998).
The offense of hindering prosecution in the first degree is defined in § 13A-10-43, Ala. Code 1975, as follows:
 "(a) A person commits the crime of hindering prosecution in the first degree if with the intent to hinder the apprehension, prosecution, conviction or punishment of another for conduct constituting a murder or a Class A or B felony, he renders criminal assistance to such person."
The indictment charges Burton as follows.
 "The Grand Jury of said County charges that before the finding of this Indictment, ANGELA BURTON, whose name is otherwise unknown to the Grand Jury, did render criminal assistance to Felicia Scott, alias Felicia Polion and/or Frederic Polion, alias Fred Polion, by intentionally hindering the apprehension, prosecution, conviction, or punishment of Felicia Scott, alias Felicia Burton, alias Felicia Polion and/or Frederic Polion, alias, Fred Polion for conduct constituting a murder or a Class A or B felony, to-wit: Murder, in that said defendant did prevent or obstruct, by means of deception, law enforcement officers and investigators, and/or [the] Tuscaloosa County, Alabama, Grand Jury, investigating the disappearance of Carethia Curry, from performing an act that might aid in the discovery or apprehension of the said Felicia Scott, alias Felicia Burton, alias Felicia Polion and/or Frederic Polion, alias Fred Polion, to-wit: locating the body of Carethia Curry, in violation of Section 13A-10-43 of the Code of Alabama."
C.R. 11.
The definition of "criminal assistance" is found at §13A-10-42(4), Ala. Code 1975. The Code section provides that "criminal assistance" occurs when one "[p]revents or obstructs, by means of force, deception or intimidation, anyone except a trespasser from performing an act that might aid in the discovery or apprehension of such person. . . ." Section 13A-10-42(4), Ala. Code 1975.
In Alabama, the offense defined as hindering prosecution has replaced the offense of being an "accessory after the fact." Before the statute was amended, the new Criminal Code was enacted, the State had to prove the following four elements to obtain a conviction for being an "accessory after the fact": "(1) knowledge of the accessory of the principal's crime, (2) commission of a complete felony, and (3) active aid (passivity excluded)" and "intent to enable [the principal] to avoid or escape from arrest, trial, conviction, or punishment." Rudolph v. State, 40 Ala. App. 398, *Page 883 
399, 114 So.2d 299, 299-300 (1959).
As yet, there is little caselaw on the crime of "hindering prosecution." However, the conduct constituting the crime of hindering prosecution would also establish the crime of being an accessory after the fact, because the elements establishing the old offense of accessory after the fact include the more narrowly defined elements constituting hindering prosecution.
Concerning hindering prosecution, this court has stated:
 "It seems clear from the language of the statutes that the State must prove three separate elements to present a prima facie case of hindering prosecution. The actor must `render criminal assistance' as that term is defined in § 13A-10-42, 1975 Alabama Code (Supp. 1981), the criminal assistance must be rendered to one who has committed a Class A or Class B felony or murder and the actor must know or believe that such person has engaged in conduct constituting the Class A or Class B felony or murder."
Nichols v. State, 500 So.2d 92, 94 (Ala.Cr.App. 1986). The Commentary to §§ 13A-10-42 through 13A-10-44 provides:
 "Section 13A-10-42, in defining the rendering of `criminal,' sets forth five specific acts that will incur liability. It should be noted that merely refusing to answer police questions concerning the fugitive, giving advice or posting bail, etc., might be termed `aid' but does not fall within the purview of the statute. As noted in the Model Penal Code (Tent. Draft No. 9), pp. 198-201, the courts have shown a reluctance to extend the law to these type situations because the community does not desire prosecution. Section 13A-10-42 prohibits harboring and concealing the fugitive; efforts to conceal the commission of the crime or to destroy evidence of the crime; warning the offender of imminent apprehension (except in an effort to comply with the law); and furnishing the offender with money with intent to facilitate his escape."
(Emphasis added.) Moreover, in addition to the elements required above, the Commentary states:
 "Under both §§ 13A-10-43 and 13A-10-44, there must be an intent to hinder apprehension, prosecution, conviction or punishment of the offender. Obviously, friends and relatives of the offender may furnish the offender with shelter, food and money but without the intent to hinder his apprehension or conviction. The motivation behind furnishing such aid will be left to the jury to evaluate after an examination of all pertinent facts."
In Nichols v. State, 500 So.2d 92 (Ala.Cr.App. 1986), the appellant's conviction for hindering prosecution was affirmed in a case where it was "clear from testimony at the trial that the appellant knowingly, willingly, and consciously lied to the criminal investigators concerning the circumstances of the rape." 500 So.2d at 95.[3] The appellant in Nichols argued that he lied to investigators "not with the intent to hinder prosecution, but because he was scared." 500 So.2d at 95. The Nichols court resolved this situation, stating the following:
 "[W]here a defendant contended that `rather than intending to hinder the apprehension of his brother, he was fleeing to prevent his own apprehension,' the court held that `[t]his need not be [his] sole intent.' State v. Kelley, 120 N.H. 14, 413 A.2d 300, 302 (1980). "`We prefer to recognize that motivations may be mixed, and to permit conviction where *Page 884 
the obstructive purpose was present.'" While `merely refusing to answer police questions concerning the fugitive . . . does not fall within the purview of [Alabama's] statute,' Commentary to §§ 13A-10-42 through 13A-10-44, 1975 Alabama Code (Supp. 1981), there is a definite distinction between refusing to answer and answering falsely. In such a situation, `the jury could reasonably find from the evidence presented that an obstructive purpose was present.' State v. Kelley, supra, 413 A.2d at 303. Deceit alone has been found insufficient where there was no evidence linking the defendant with the underlying crime. People v. Lorenzo, 110 Misc.2d 410, 442 N.Y.S.2d 726 (1981). Such `deceptions may not be good citizenship; are indeed suspicious, but do not meet statutory requirements for criminal liability.' Id. at 732."
500 So.2d at 95, (footnotes omitted).
There was no testimony presented in this case indicating that Burton knew the location where Scott and Polion had disposed of Curry's body. However, Burton was not found guilty of hindering prosecution for failing to disclose where Curry's body had been disposed of. Burton's culpability for hindering the prosecution of Scott and Polion stems from the fact that she was closely linked to Scott and Polion and closely linked to the events surrounding the murder, and she was not truthful in several of her responses to investigators. These overt acts of lying furthered the progress of Scott and Polion's criminal activity and prevented the quick recovery of Curry's body, which was evidence of the murder.
Here, the police were initially investigating Carethia Curry's disappearance. When asked in early February 1996, Burton told police that she did not know where Curry was.[4] Though this answer may have been technically correct, testimony was presented, if believed by the jury, that Burton had seen Curry's mutilated corpse in the trunk of Scott and Polion's automobile.
We agree with the State's assertion that Burton was not forthcoming with information regarding Curry when she was questioned. During its case-in-chief, the prosecution continually emphasized the numerous instances were Burton was not helpful in providing information to investigators. The prosecution placed great emphasis on the fact that Burton did not tell the police about Kenneth Harris and the wrecker incident, about Lee Turner and the telephone calls between her and Turner, about Jerry Davis, and about the purchase of a 45-gallon trash can. However, there is absolutely nothing in the record to suggest that this information would have answered any question asked of Burton by the police. Moreover, whether these omissions were innocent oversights or deliberate immoral conduct is inconsequential, because withholding this information was not illegal.
The law does not require a defendant charged with hindering prosecution to be forthcoming in his or her disclosures to the police; it does require the defendant to *Page 885 
answer police questions truthfully. "`[M]erely refusing to answer police questions concerning the fugitive . . . does not fall within the purview of [Alabama's] statute.' . . . [T]here is a definite distinction between refusing to answer and answering falsely."Nichols v. State, 500 So.2d 92, 95 (Ala.Cr.App. 1986). Alabama has also recognized that deceiving the police by conduct described in People v. Lorenzo, 110 Misc.2d 410,442 N.Y.S.2d 726 (1981), is not criminal conduct. Lorenzo
involved a situation were a defendant, with no link to the person convicted of the underlying crime, lied to police in an effort to avoid becoming involved in the investigation. If a witness to a murder has no link whatsoever to the murderer, then the witness's assertions that he or she was somewhere else at the time of the murder and did not see the murder, even though those assertions were untrue, would not constitute hindering prosecution. Lorenzo held that such conduct is: "consistent with a desire not to be involved in the absence of any link to the assassin." 110 Misc.2d at 418,442 N YS.2d at 732. Nevertheless, evidence of the numerous instances when Burton withheld information, although that conduct alone was not illegal, may be considered by the jury as indicative of her intent to hinder the investigation and the prosecution by the police.
The crux of the State's case must rest on those few responses to investigating officers contained in the record that the jury could have believed were patently false. It is cause for concern that the record does not better reflect what questions investigators posed to Burton during their investigation and does not better reflect the officers' recollection of Burton's responses. It is accurate to conclude that relevant facts tending to prove that Burton was guilty of hindering prosecution were only dimly highlighted during the State's case.
Nevertheless, the State did prove a prima facie case of hindering prosecution. The State showed that Burton lied to police on February 10, 1996, about placing telephone calls to hospitals in the early morning of February 1 searching for Scott. Her telephone records showed that these calls were not made. She also stated that Polion had telephoned her several times from his and Scott's home during the very early morning hours of February 1, 1996, searching for Scott and wanting Burton to find out if Scott was at the hospital. The last of these calls was allegedly at 4:48 a.m. Telephone records did not show that any calls were placed from Polion's home to Burton at that time. These falsehoods alone placed sufficient evidence before the jury indicating that Burton had deliberately obstructed the investigation into Curry's disappearance and murder. These falsehoods could have had only two purposes: to remove police suspicion from Polion by corroborating his protestations of innocence, and to distance Burton from any possible suspicion of or connection to wrongdoing.
This was sufficient evidence on which to deny a motion for a judgment of acquittal. Moreover, during the defense's case, Burton's own testimony made it obvious that investigators had asked Burton whether she had seen Curry since Curry's disappearance. Burton stated that in addition to statements given to police on February 7, and on February 10, and her grand jury testimony, she had spoken with police many more times because officers would telephone her and ask her questions. She stated that she spoke to Officer Everett before February 7, 1996. According to Burton:
 "They were asking me did I know anything about the missing of Carethia [sic] and I told them no. They asked me when was the last time I had seen Carethia and I told them that. They asked *Page 886 
me about Frederic and Felicia. I told them that they had come to my house in Birmingham."
R. 788. Thus, Burton's own assertions make it clear that she was asked by police what she knew about Curry's disappearance and that she lied when she told them that she knew nothing. Assertions by Burton that she had not seen Curry during her disappearance are blatant falsehoods. Burton last saw Curry in the trunk of Scott's car. She obviously did not tell the police this. Such conduct can be construed only as a deliberate attempt to obstruct the investigation into Curry's disappearance and murder. Thus any concerns or doubts that Burton lied to officers about seeing Curry after her disappearance were eradicated by Burton's own testimony.
 II.
Burton contends that the trial court erred in admitting into evidence photographs of the body of Carethia Curry.
According to Burton, the trial court abused its discretion in admitting Exhibits 63 and 65 through 82, photographs introduced during the testimony of Dr. Robert Brissie, the chief coroner and medical examiner in Jefferson County, concerning his autopsy of Curry. Burton argues that although the photographs were relevant to prove that Curry was murdered, the emotional impact these photographs had on the jury greatly outweighed their relevance and resulted in prejudicing the jury against Burton, who was not charged with the underlying offense of capital murder. Burton asks this court to find these photographs inadmissible because she is charged only with hindering prosecution, and not with the underlying crime which gave rise to the photographs.
Burton contends that the photographs should have been excluded under Rule 403, Ala.R.Evid. Rule 403 states:
 "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."
However, "[t]he State has the burden of proving beyond a reasonable doubt that the person whose prosecution was hindered actually committed the felony. . . . Thus, the underlying crime is an essential element of the offense of hindering prosecution and must be adequately proved." Nichols, 500 So.2d at 94.
 "In People v. Bulger, 52 A.D.2d 682, 382 N.Y.S.2d 133
(1976), a case of hindering prosecution in the first degree in regard to a murder committed by the accused's brother, the defendant contended that certain testimony about the murder and exhibits, including a bloody shirt from the murder, were inflammatory and prejudicial. The court held `[e]vidence that is probative of a material issue in the case will not be rejected even though inflammatory or gruesome. [Citation omitted.] Furthermore, in order to present a prima facie case of hindering prosecution in the first degree, it is necessary for the People to prove that assistance was knowingly rendered to a person who had committed a Class A felony.' Id. at 135."
Nichols, 500 So.2d at 95. Here, the photographs were relevant to show how Curry's abdomen was cut open, to explain the entrance and exit wounds inflicted by the gunshots, and to show how her body was disposed of. The result of Dr. Brissie's testimony concerning these photographs was his conclusion that Curry died of unnatural causes, i.e., that she had been killed by someone. The photographs admitted into evidence in this case were probative to prove the material issue that a *Page 887 
Class A felony had been committed, even though they were gruesome.
In addition to our ruling in Nichols, we find Spear v. State,508 So.2d 306 (Ala.Cr.App. 1987), to be dispositive.
 "The appellant contends that the trial court erred in admitting what he considers `extensive and overbroad' evidence of the murder from which his conviction stems. He argues specifically that certain testimony . . . and the photos of the victim were irrelevant, `inflammatory and prejudicial.'"
508 So.2d at 309.
We found Spear's contention to be without merit. We ruled:
 "In light of the fact that the commission of the murder was an essential element of the crime charged, we consider this evidence highly relevant. The trial judge has broad discretion in this regard and this court will not interfere with the exercise of that discretion absent a clear showing of abuse.
 "In addition, we find that no `substantial danger of undue prejudice' existed with respect to this evidence. The photos were not particularly `gruesome'; however, even had they been `ghastly', their admission would not have been erroneous. As long as a photo is relevant, its gruesomeness is no reason for excluding it, even though it is `cumulative evidence based on an undisputed matter.'"
Spear, 508 So.2d at 309 (emphasis added; citations omitted.)
The photographs in the present case were indeed gruesome. Even so, based on Spear and Nichols, both hindering-prosecution cases, their admission was proper. One of the elements of hindering prosecution in the first degree is proof that a murder or a Class A or Class B felony has been committed. Clearly, the photographs depict the atrocious crime perpetrated on this teenage girl. Arguably, if Burton saw the body depicted in these photographs she knew with certainty that a terrible crime had been committed. Thus, the photographs specifically addressed the element of hindering prosecution requiring proof that a crime has been committed.
The admission of the photographs was within the sound discretion of the trial judge, and our review discloses no abuse of that discretion. The photographs were admissible to establish the underlying murder of Carethia Curry, an element in this case of hindering prosecution in the first degree.
Angela Burton's conviction for hindering prosecution is affirmed.
AFFIRMED.
Long, P.J., and McMillan, Baschab, and Fry, JJ., concur.
[1] The "New Kids on the Block" was a singing group popular around this time.
[2] Detective Steele's first name was not in the record.
[3] Unfortunately, the Nichols opinion does not include a detailed account of the facts.
[4] The following testimony from Officer Hearing reflects the only specific question asked of an investigating officer in this case seeking to determine specifically what Burton was asked and what her answer was concerning Curry's disappearance.
 "Q [Prosecutor]: Did you ask Angela Burton where Carethia Curry was?
"A [Officer Hearing]: Yes —
". . .
 "Q. On either day, February 7, or February the 10, 1996, did Angela Burton ever tell you where Carethia Curry was?
"A: No, she did not."
R. 526.