783 So.2d 887 (2000)
Ex parte Angela BURTON.
(Re Angela Burton v. State).
1981604.
Supreme Court of Alabama.
July 28, 2000.
As Modified on Denial of Rehearing November 3, 2000.
*888 Joseph G. Pierce, Tuscaloosa, for petitioner.
Bill Pryor, atty. gen., and Stephanie N. Morman, asst. atty. gen., for respondent.
PER CURIAM.
Angela Burton was convicted of "hindering prosecution in the first degree," a crime defined by § 13A-10-43, Ala.Code 1975, and was sentenced to 17 years' imprisonment. The Court of Criminal Appeals affirmed. Burton v. State, 783 So.2d 874 (Ala.Crim.App.1999). We granted Burton's petition for certiorari review. She argues that the trial court should have granted her motion for a judgment of acquittal and that the Court of Criminal Appeals erred in holding that the State had proved a prima facie case of the specific charge set out in the indictment against her. We agree. We reverse the judgment of the Court of Criminal Appeals and render a judgment of acquittal.

Facts
Burton's conviction was based on her allegedly rendering criminal assistance to her sister, Felicia Scott, and her sister's boyfriend, Frederic Polion, following the murder of Carethia Curry. Curry was nine months pregnant when she was shot twice in the head after having her stomach cut open and her baby taken out. Burton's indictment read as follows:
"The Grand Jury of said County charge that before the finding of this Indictment, ANGELA BURTON, whose name is otherwise unknown to the Grand Jury, did render criminal assistance to Felicia[1] Scott, alias Felicia Burton, alias Felicia Polion and/or Frederic[2] Polion, alias Fred Polion, by intentionally hindering the apprehension, prosecution, conviction, or punishment of Felicia Scott, alias Felicia Burton, alias Felicia Polion and/or Frederic Polion, alias Fred Polion for conduct constituting a Murder or a Class A or B felony, to wit: Murder, in that said defendant did prevent or obstruct, by means of deception, law enforcement officers and investigators, and/or the Tuscaloosa County, Alabama, Grand Jury, investigating the disappearance of Carethia Curry, from performing an act that might aid in the discovery or apprehension of the said Felicia Scott, alias Felicia Burton, alias *889 Felicia Polion and/or Frederic Polion, alias Fred Polion, to wit: locating the body of Carethia Curry, in violation of Section 13A-10-43 of the Code of Alabama."
The testimony in this case was extensive; it is summarized here. Carolyn O'Neal, Curry's mother, testified that on January 31, 1996, she and Curry had gone shopping for baby clothes with Felicia Scott. O'Neal testified that Curry and Scott discussed going to get pizza and that Scott commented that the "two pregnant women" (referring to herself and Curry) were going to eat pizza. O'Neal testified that Burton was there but made no comment about her sister's statement because Burton was arguing with her boyfriend, Anthony Rowser. Later that day, Scott picked up Curry so they could go eat pizza.
On February 1, 1996, Scott told O'Neal that she had dropped Curry off at home the evening before, at 8:30 p.m., and that after that she (Scott) had been in Birmingham having her baby. O'Neal testified that she knew Scott had had a hysterectomy and could not have any more children. O'Neal telephoned the police and reported that Scott and Polion had kidnapped her daughter. On February 5, 1996, when O'Neal learned that Scott had come home with a baby, she telephoned the police and told them she believed Scott had her daughter's baby and that her daughter was still missing.
Officer Toni Everett testified that on February 5, 1996, she went to Polion and Scott's residence. Upon seeing a newborn infant, she inquired as to whether the baby belonged to Curry. Scott and Polion told Everett that the baby was their baby. Officer Everett testified that she took a statement from Burton on February 7, 1996. She testified that Burton told her that Scott, Polion, Scott's two boys, and the new baby had come to Burton's home in Birmingham about 11:00 a.m. on February 1, 1996, that they left the next day, and that she did not know where Scott was.
Investigator Michael Hearing testified that he first spoke to Burton when she gave a statement to Officer Everett on February 7, 1996, and that he spoke to her again on February 10, 1996. He testified that Burton told him Scott arrived at her house at 2:00 or 3:00 a.m. on February 1, 1996. Hearing testified that a search of Burton's storage facility on March 25, 1996, revealed an incomplete set of sheets carrying a logo of a musical group known as New Kids on the Block. He later discovered that the missing sheet matched the sheet that Curry's body was wrapped in when it was found. He testified that he obtained Burton's telephone records in late April 1999, and they showed that she had made 24 calls to Lee Curtis Turner, Jr., Burton's ex-boyfriend. Hearing testified that Burton told him that Polion had telephoned her several times from his home asking her to call Birmingham area hospitals to see if she could find Scott, and that she had made calls to several hospitals looking for Scott.[3] Burton's telephone records *890 did not reflect that these calls were made on February 1, 1996. Hearing testified that there was no evidence that Burton knew where Curry's body was disposed of.
Lee Curtis Turner, Jr., testified that Burton called him on February 1, 1996, at approximately 10:00 p.m. and pleaded with him to come over.[4] When he arrived, he said, Burton told him that Scott and Polion had arrived at her home unexpectedly with a newborn they said was their baby, and that she showed him the baby. Turner testified that Burton had told him on prior occasions that Scott could not have children. He testified that Burton told him that Scott had told Burton she needed to hide the body of a man she had killed after he had tried to rape her. He testified that Burton told him she thought Scott was joking so she asked to see the body. Turner testified that Burton told him Scott opened the trunk of Polion's car and showed Burton the body of Curry, which Burton said had been cut wide open and the baby removed from it. Turner testified that in April 1996, when he was contacted by members of the Tuscaloosa Police Department Homicide Unit, he contacted Burton and that she asked him not to tell the police anything about what she had told him, but that he could tell the police that he saw the baby and that she had said she did not know whose baby it was.
Anthony Rowser testified before the grand jury in Burton's case. He testified that Burton had told him that Scott could not have children, that Scott had told Burton that she had killed Curry, that Scott told Burton that Scott went to the house of a friend, Jerry Davis,[5] to get rid of the body, and that Scott had bought the garbage can used for disposing of the body from a WalMart store. Rowser recanted this testimony at trial. He testified that he had made up the story he reported to the police, while he was in jail, and that he had testified falsely to the grand jury because he was upset with Burton over a harassment warrant she had sworn against him.
On her appeal to the Court of Criminal Appeals, Burton raised two arguments: (1) that the trial court erred in denying her motion for a judgment of acquittal; and (2) that the trial court erred in admitting into evidence photographs of Curry's mutilated body. The Court of Criminal Appeals affirmed. She raises only that first issue on certiorari review in this Court.

Standard of Review
"Appellate courts are limited in reviewing a trial court's denial of a motion for judgment of acquittal grounded on insufficiency." McFarland v. State, 581 So.2d 1249, 1253 (Ala.Crim.App.1991). "The standard of review in determining sufficiency of evidence is whether evidence existed at the time of [the defendant's] motion for acquittal was made, from which *891 the jury could by fair inference find the [defendant] guilty." Linzy v. State, 455 So.2d 260, 261 (Ala.Crim.App.1984) (citing Stewart v. State, 350 So.2d 764 (Ala.Crim. App.1977), and Hayes v. State, 395 So.2d 127 (Ala.Crim.App.), writ denied, 395 So.2d 150 (Ala.1981)). In determining the sufficiency of the evidence, we view the evidence in the light most favorable to the State. Linzy, supra.

Discussion
Burton moved for a judgment of acquittal at the close of the State's case, and she renewed her motion after the defense had rested. She contends that the State failed to make out a prima facie case of the hindering-prosecution charge set out in her indictment. Section 13A-10-43(a), Ala.Code 1975, sets out the elements of the offense known as "hindering prosecution in the first degree":
"(a) A person commits the crime of hindering prosecution in the first degree if with the intent to hinder the apprehension, prosecution, conviction or punishment of another for conduct constituting a murder or a Class A or B felony, he renders criminal assistance to such person."
Thus, in order to convict on the hindering-prosecution charge, the State had to prove that Burton rendered criminal assistance to a person whose conduct had constituted murder or a Class A or B felony, and that she rendered that criminal assistance with the intent to hinder the apprehension, prosecution, conviction, or punishment of that person. Section 13A-10-42, Ala.Code 1975, lists five acts that constitute "criminal assistance." The indictment charged Burton with the act set out in subsection (4) of § 13A-10-42, which provides that a person renders criminal assistance to another person if he or she "[p]revents or obstructs, by means of force, deception or intimidation, anyone except a trespasser from performing an act that might aid in the discovery or apprehension of such person...." Thus, under the indictment brought against her, and pursuant to § 13A-10-42(4), Burton could have rendered the criminal assistance charged only if she prevented or obstructed law-enforcement officers from performing an act that might have aided in the "discovery or apprehension" of Scott and Polion. The State's indictment alleged that Burton, by means of deception, prevented or obstructed law-enforcement officers from performing the act of locating Curry's body, an act the State alleged would have aided the officers in the "discovery" of Scott and Polion.
The Court of Criminal Appeals held:
"There was no testimony presented in this case indicating that Burton knew the location where Scott and Polion had disposed of Curry's body. However, Burton was not found guilty of hindering prosecution for failing to disclose where Curry's body had been disposed of. Burton's culpability for hindering the prosecution of Scott and Polion stems from the fact that she was closely linked to Scott and Polion and closely linked to the events surrounding the murder, and she was not truthful in several of her responses to investigators. These overt acts of lying furthered the progress of Scott and Polion's criminal activity and prevented the quick recovery of Curry's body, which was evidence of the murder."
783 So.2d at 884. The Court of Criminal Appeals further stated:
"The crux of the State's case must rest on those few responses to investigating officers contained in the record that the jury could have believed were patently false. It is cause for concern that the record does not better reflect what questions investigators posed to Burton during their investigation and *892 does not better reflect the officers' recollection of Burton's responses. It is accurate to conclude that relevant facts tending to prove that Burton was guilty of hindering prosecution were only dimly highlighted during the State's case.
"Nevertheless, the State did prove a prima facie case of hindering prosecution. The State showed that Burton lied to police on February 10, 1996, about placing telephone calls to hospitals in the early morning of February 1 searching for Scott. Her telephone records showed that these calls were not made. She also stated that Polion had telephoned her several times from his and Scott's home during the very early morning hours of February 1, 1996, searching for Scott and wanting Burton to find out if Scott was at the hospital. The last of these calls was allegedly at 4:48 a.m. Telephone records did not show that any calls were placed from Polion's home to Burton at that time. These falsehoods alone placed sufficient evidence before the jury indicating that Burton had deliberately obstructed the investigation into Curry's disappearance and murder."
783 So.2d at 885.
Viewing the evidence in a light most favorable to the State, even if we assume that Burton did lie about Polion's calling her in the early-morning hours of February 1, 1996 and about her calling hospitals in search of her sister, this evidence is insufficient to sustain a conviction of hindering prosecution in the first degree. It is important to note that the indictment charged that Burton hindered prosecution by preventing investigators from performing an actspecifically, locating Curry's bodythat might have aided in the discovery and apprehension of Scott and Polion. Contrary to the Court of Criminal Appeals' holding, Burton's falsehoods regarding the telephone calls between her and Polion could not have prevented investigators from discovering Scott and Polion, because these statements were made after Scott and Polion had been apprehended on February 8, 1996, in Gwinett County, Georgia. Thus, under the indictment, the purpose of locating Curry's body was to aid in discovering and apprehending Scott and Polion. This Court has held:
"A defendant is constitutionally entitled to be informed of the nature and the cause of the accusation against him. The function of the indictment is to inform the accused of the crime with which he is charged, so that he may prepare a defense if one is available. The person accused of a crime is required at trial to answer only the specific charge contained in the indictment."
Ex parte Washington, 448 So.2d 404, 407 (Ala.1984) (citations omitted). Burton was required only to answer the specific charge contained in the indictment and, thus, could be found guilty on hindering prosecution only if she was found to have prevented investigators from "performing an act that might aid in the discovery or apprehension" of Scott and Polion. Once Scott and Polion were apprehended, Burton could not have prevented investigators from discovering or apprehending them.
The Court of Criminal Appeals also stated, "Burton's own assertions make it clear that she was asked by police what she knew about Curry's disappearance and that she lied when she told them that she knew nothing." 783 So.2d at 886. Burton testified that she spoke to Officer Everett before she gave a statement on February 7, 1996. It is unclear from the record when investigators first spoke with Burton, because Burton testified only that she spoke with Officer Everett before February 7, 1996, and Officer Everett could not recall when she first contacted Burton. Burton testified that Officer Everett *893 asked her if she knew anything about Curry's disappearance and that she said no. Whether Burton lied when she told Officer Everett that she did not know anything about Curry's disappearance is a disputed issue because Burton's ex-boyfriend, Lee Curtis Turner, Jr., testified that Burton told him she had seen Curry's body in the trunk of Polion's car. Nevertheless, viewing the evidence in the light most favorable to the State, we must conclude that the evidence was insufficient to support a conviction for hindering prosecution in the first degree as alleged in the indictment. Hearing testified that there was no evidence that Burton knew where Scott and Polion had disposed of Curry's body. It is undisputed that Scott and Polion left Burton's home on February 2, 1996. Nothing in the record suggests that Burton knew where Scott and Polion went once they left her home or that Burton had any contact with Scott or Polion after they left her home. It is difficult to comprehend how Burton's alleged deception regarding her knowledge about Curry's disappearance prevented investigators from locating Curry's body or from discovering or apprehending Scott and Polion, when the undisputed evidence demonstrates that investigators knew of no evidence suggesting that Burton knew where Curry's body had been disposed of or knew where Scott and Polion went after they left her home.
Furthermore, it is even more difficult to conclude that Burton, by lying in her statements to police on February 7 and 10, 1996, prevented investigators from discovering and apprehending Scott and Polion, given that Officer Everett had actually found Scott and Polion and had spoken with them at their residence on February 5, 1996. On that day, Everett discovered that Scott and Polion had a newborn in their possession. When Everett asked who the baby belonged to, Scott and Polion told her it was their baby. She testified that Scott told her she had had prenatal care at the Tuscaloosa County Health Department. Officer Everett asked Scott to sign a medical-release form. Scott complied. The Health Department orally informed Officer Everett the next day that Scott had not received prenatal care at its facility and that she had actually had a hysterectomy. Unfortunately, when officers returned to Scott and Polion's residence, they were gone. Scott and Polion were discovered in Gwinett County, Georgia, on February 8, 1996, and Scott was arrested and charged with interference with custody.
Under the language of the indictment, and pursuant to § 13A-10-42(4), Burton's culpability could stem only from preventing or obstructing someone "from performing an act that might aid in the discovery or apprehension" of Scott and/or Polion. Because Burton made her statements after law-enforcement officials actually had located and questioned Scott and Polion on February 5, 1996, and after Scott and Polion had been apprehended in Gwinett County, Georgia, we hold that the State failed to present a prima facie case of hindering prosecution, as alleged in the indictment, and that the trial court should have granted Burton's motion for a judgment of acquittal. The Court of Criminal Appeals erred in affirming Burton's conviction. We reverse the judgment of that court and render a judgment of acquittal.
REVERSED AND JUDGMENT OF ACQUITTAL RENDERED.
HOOPER, C.J., and COOK, SEE, LYONS, JOHNSTONE, and ENGLAND, JJ., concur.
HOUSTON, J., concurs in the result.
BROWN, J., dissents.
BROWN, Justice (dissenting).
While I agree that "[t]he person accused of a crime is required at trial to answer *894 only the specific charge contained in the indictment," Ex parte Washington, 448 So.2d 404, 407 (Ala.1984) (citing Geeter v. State, 35 Ala.App. 207, 45 So.2d 167 (1950)), I disagree with the conclusion that the evidence presented by the state in this case failed to make a prima facie case of hindering prosecution as alleged in the indictment.
The indictment charged Burton with hindering prosecution by preventing or obstructing, by means of deception, law-enforcement officers from performing an act that might aid in the discovery or apprehension of Felicia Scott and Frederic Polion. I believe the evidence presented was sufficient to make a prima facie case on that charge. While investigating the disappearance of Carethia Curry, the law-enforcement officers quickly centered their inquiry on Felicia Scott and Frederic Polion. Officers interviewed Burton, Scott's sister, several times-both before and after they had apprehended Scott and Polion. They asked Scott if she had seen Curry. Although Burton had, in fact, seen Curry's body in the trunk of Polion's car on February 1, 1996, she told the officers that she had not seen Curry. Indeed, Burton had telephoned Lee Curtis Turner on the night of February 1 and had begged him to come over. He testified that when he arrived Burton told him that Scott and Polion had arrived at her home unexpectedly with a newborn they said was their baby. Turner further testified that Burton told him that Scott told her she needed to hide the body of a man she had killed after he had tried to rape her. According to Turner, Burton said that she thought her sister was joking; that she asked to see the body; and that Scott opened the trunk of Polion's car and inside the trunk was the body of Carethia Curry, rather than that of a man. Turner further testified that Burton told him that Curry's body had been cut wide open and her baby removed.
After Scott and Polion were apprehended in Georgia, but before Curry's body had been located, the police interviewed Burton again. Burton's responses were similarly unhelpful. The Court of Criminal Appeals determined that although the state's evidence was slight, it was, nevertheless, sufficient to submit the case to the jury. That Court noted:
"There was no testimony presented in this case indicating that Burton knew the location where Scott and Polion had disposed of Curry's body. However, Burton was not found guilty of hindering prosecution for failing to disclose where Curry's body had been disposed of. Burton's culpability for hindering the prosecution of Scott and Polion stems from the fact that she was closely linked to Scott and Polion and closely linked to the events surrounding the murder, and she was not truthful in several of her responses to investigators. These overt acts of lying furthered the progress of Scott and Polion's criminal activity and prevented the quick recovery of Curry's body, which was evidence of the murder.
"Here, the police were initially investigating Carethia Curry's disappearance. When asked in early February 1996, Burton told police that she did not know where Curry was. Though this answer may have been technically correct, testimony was presented, if believed by the jury, that Burton had seen Curry's mutilated corpse in the trunk of Scott and Polion's automobile.
". . . .
"The crux of the State's case must rest on [Burton's] few responses to investigating officers contained in the record that the jury could have believed were patently false. It is cause for concern that the record does not better *895 reflect what questions investigators posed to Burton during their investigation and does not better reflect the officers' recollection of Burton's responses. It is accurate to conclude that relevant facts tending to prove that Burton was guilty of hindering prosecution were only dimly highlighted during the State's case.
"Nevertheless, the State did prove a prima facie case of hindering prosecution. The State showed that Burton lied to police on February 10, 1996.... These falsehoods alone placed sufficient evidence before the jury indicating that Burton had deliberately obstructed the investigation into Curry's disappearance and murder. These falsehoods could have had only two purposes: to remove police suspicion from Polion by corroborating his protestations of innocence, and to distance Burton from any possible suspicion of or connection to wrongdoing.
"This was sufficient evidence on which to deny a motion for a judgment of acquittal."
783 So.2d at 884-85.
In Ex parte Woodall, 730 So.2d 652 (Ala. 1998), this Court addressed the role of appellate courts in reviewing the sufficiency of the evidence in a criminal case:
"`In determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution. Faircloth v. State, 471 So.2d 485 (Ala.Cr. App.1984), aff'd, 471 So.2d 493 (Ala. 1985).' Powe v. State, 597 So.2d 721, 724 (Ala.1991). It is not the function of this Court to decide whether the evidence is believable beyond a reasonable doubt, Pennington v. State, 421 So.2d 1361 (Ala.Cr.App.1982); rather, the function of this Court is to determine whether there is legal evidence from which a rational finder of fact could have, by fair inference, found the defendant guilty beyond a reasonable doubt. Davis v. State, 598 So.2d 1054 (Ala.Cr. App.1992). Thus, `[t]he role of appellate courts is not to say what the facts are. [Their role] is to judge whether the evidence is legally sufficient to allow submission of an issue for decision [by the finder of fact].' Ex parte Bankston, 358 So.2d 1040, 1042 (Ala.1978) (emphasis original)."
730 So.2d at 658.
Although Burton's lies to law-enforcement officers did not ultimately prevent the apprehension and prosecution of Scott and Polion, her lies, nevertheless, delayed their being brought to justice. I believe that the evidence presented by the state did, in fact, make a prima facie case of hindering prosecution, as alleged in the indictment. See Nichols v. State, 500 So.2d 92, 93 (Ala.Crim.App.1986). Therefore, the trial court correctly denied Burton's motion for a judgment of acquittal. Accordingly, I would affirm the Court of Criminal Appeals' judgment upholding Burton's conviction.
NOTES
[1] At other points in the record, this name is spelled "Felecia."
[2] At other points in the record, this name is spelled "Fredrick" or "Frederick."
[3] Burton disputes Hearing's testimony. She testified at her trial as follows:

"Q. Okay. Now, the state has said several things about a statement wherein you claim that you had called a number of hospitals looking for [Felicia] or
"A. Yes, sir.
"Q. Did you ever make that statement?
"A. Yes, sir, I did.
"Q. Okay. When, where and under what circumstances did you say that?
"A. They were questioning me about hospital visits and doctor visits that [Frederic] and [Felicia] claimed they had went on. And I told them one time [Frederic] had called and said that he was late getting back and he supposedly went to a doctor visit with [Felicia], would I call and find out where-which hospital, what doctor's office she was in. She had to get some tests run or something. [Frederic] had said.
"Q. Okay. You were asked to do that?
"A. Yes, I was.
"Q. All right. By [whom]?
"A. By [Frederic].
"Q. Okay. When?
"A. It was in her early months of pregnancy because they supposed to have been running tests on her.
"Q. Okay. So that happened but that did not happen at any point between?
"A. Not during this time period."
[4] Telephone records show that the calls between Burton and Turner did not end until approximately 11:30 p.m. Turner testified that he arrived at her home at 10:15 or 10:30 p.m.
[5] Jerry Davis testified that he left work at 4:30 or 5:00 a.m., and upon returning home discovered a car backed up in his yard. He testified that the car was pulling out, as he was pulling in, and that he stopped the car to see who it was. He testified that Scott and Polion were in the car.