NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by email at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: https://www.courts.nh.gov/our-courts/supreme-court

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Strafford
Case No. 2022-0306
Citation: State v. Collins, 2024 N.H. 7

THE STATE OF NEW HAMPSHIRE

v.

GREGORY M. COLLINS

Argued: November 14, 2023
Opinion Issued: February 2, 2024

John M. Formella, attorney general, and Anthony J. Galdieri, solicitor general (Elizabeth C. Woodcock, senior assistant attorney general, on the brief and orally), for the State.

Rothstein Law LLC, of Exeter (David M. Rothstein on the brief and orally), for the defendant.

DONOVAN, J.

[¶1] The defendant, Gregory M. Collins, appeals his conviction of selling a controlled drug resulting in death in violation of RSA 318-B:26, IX (Supp. 2023). The defendant argues that the Superior Court (Howard, J.) erred by: (1) denying his motion to recuse the Strafford County Attorney's Office (SCAO); and (2) denying his motions to dismiss the charge based upon insufficient

evidence. We conclude that the alleged conflict of interest in this case cannot be imputed to the entire county attorney's office and that the trial court's finding that the measures taken by the SCAO were sufficient to avoid any appearance of conflict was a sustainable exercise of its discretion. We also conclude that the defendant has not met his burden of demonstrating that the evidence was insufficient to prove his guilt. Accordingly, we affirm.

## I. Facts

[¶2] The jury could have found, or the record otherwise supports, the following facts. On February 15, 2018, the decedent's mother rented a room for him at a motel and gave him twenty dollars for food. Soon after arriving at the motel, the decedent contacted multiple people soliciting the purchase of drugs. At approximately 1:30 p.m., he contacted Peter Miltner asking him for a "40," which represents a request for approximately half a gram of either heroin or fentanyl for forty dollars. Miltner, in turn, contacted the defendant, who was his source for heroin and fentanyl, asking, "Come scoop me. I got a sale for you."

[¶3] Around 2 p.m., the defendant and Miltner drove to the motel where the decedent was staying, and the defendant gave Miltner a bag containing approximately half a gram of fentanyl. Miltner then took the bag to the decedent's motel room. Because the decedent had only twenty dollars, Miltner contributed twenty dollars of his own. The decedent and Miltner inhaled the fentanyl, and Miltner left with the defendant shortly thereafter. Miltner did not notice whether the decedent had consumed all of his portion of the fentanyl while they were together.

[¶4] That afternoon, the decedent's mother began messaging him, but the decedent did not respond to any of her messages after 1:46 p.m. The following morning, the decedent's mother called the motel manager to ask that the manager perform a welfare check, and, thereafter, the manager found the decedent's body in his room and called 911. The police confirmed the decedent's identity and observed a cell phone, an uncapped syringe, a blue bottle cap with drug residue, and a pack of cigarettes on the table in the room. Although the chief medical examiner for the State of New Hampshire did not perform an autopsy, she determined that the decedent died from acute fentanyl intoxication.

[¶5] The defendant was subsequently indicted on one count of dispensing a controlled substance – death resulting. See RSA 318-B:26, IX. At the first arraignment, the parties conferred about a potential conflict of interest involving the legal assistant to the Strafford County Attorney and the defendant. The defendant previously had a romantic relationship with the legal assistant, and although they had not been in a relationship since 2003, the former couple share a child. When the defendant's indictment became public,

the legal assistant obtained a favorable ex parte order modifying her parental rights and responsibilities with respect to their child. The county attorney assured the defense that the legal assistant would be "walled off" and would have no internal access to the defendant's case information. Specifically, the county attorney represented that the legal assistant had no access to the case file, members of the SCAO were instructed not to speak with the legal assistant about the case, and the county attorney recused himself from the case, delegating the prosecution to the deputy county attorney and an assistant county attorney. The defendant did not object to these measures.

[¶6] After the arraignment, the defendant submitted an alibi defense, claiming that he was picking up his child at the time of the alleged drug sale. The State then notified the defense of its intent to call the legal assistant as a witness at trial to rebut the alibi defense. The defendant subsequently withdrew his alibi defense. During the defendant's first trial in March 2019, the State attempted to call the legal assistant as a fact witness. The defendant objected on discovery grounds. Based on the untimely disclosure, the trial court limited the legal assistant's potential testimony, and the State did not call her as a witness. The March 2019 trial resulted in a mistrial due to a deadlocked jury.

[¶7] In June 2019, the defendant filed a motion to dismiss the charge for prosecutorial misconduct or, in the alternative, to recuse the SCAO from prosecuting the case at his second trial based upon an alleged direct conflict of interest or the appearance thereof. The defendant argued that a direct conflict of interest existed due to his prior relationship with the legal assistant, asserting that "it would cause a fair-minded, objective observer to conclude that the prosecutor's neutrality, judgment, or ability to administer the law in an objective manner may be compromised." The defendant contended that an outside law enforcement agency, rather than the SCAO, should have interviewed the legal assistant. The defendant claimed that, by interviewing the legal assistant, the SCAO "provid[ed] an incentive for either [the legal assistant] to provide false information for favor from her employer or for her employer to provide benefits to [the legal assistant] based on the outcome of her information and/or testimony." Further, the defendant argued that the legal assistant benefited by the SCAO's decision to prosecute the defendant because she gained sole custody of the child as a result of the defendant's indictment.

[¶8] The trial court denied the defendant's motion. The court ruled that New Hampshire Rule of Professional Conduct 1.7, which states that "a lawyer shall not represent a client if the representation involves a concurrent conflict of interest," was not applicable because "prosecutors do not represent clients in the traditional sense." The trial court concluded that there was no direct conflict of interest and that "the prosecutors' co-worker relationship with [the

legal assistant] does not rise to the level of a 'personal interest' that would infringe on their ability to prosecute the defendant ethically."

[¶9] The trial court next considered whether an appearance of a conflict of interest existed and determined that the SCAO implemented safeguards sufficient to avoid such an appearance. The trial court reasoned that the legal assistant's status as a coworker of the prosecutors, standing alone, was insufficient to establish the appearance of a conflict of interest because "the question is not whether [the legal assistant] has an interest in this litigation, but whether the prosecutors on the case do." The trial court also rejected the defendant's argument that the SCAO's efforts to wall the legal assistant off from the matter were insufficient because she obtained a favorable ex parte parenting order before the defendant learned of the indictment. Instead, the trial court noted that, even if true, the legal assistant obtained the ex parte order only after the indictment became publicly available. For these reasons, the trial court found that "a fully informed, disinterested observer would not conclude that there is sufficient doubt as to the [SCAO's] ability to prosecute this case in an impartial manner." The State did not call the legal assistant as a witness at the defendant's second trial.

[¶10] The second trial commenced in October 2021. At trial, the chief medical examiner for the State of New Hampshire testified that she was "94.5 percent confident that [the decedent] died from a fentanyl overdose." Although the medical examiner's office did not perform an autopsy, she testified that her conclusion was based upon many factors, including the presence of a recent injection site on the decedent's body, the fact that the decedent was twenty-eight years old and did not have any known medical conditions, and a toxicology report indicating that the decedent had high levels of fentanyl in his body. The medical examiner estimated that the decedent died more than twelve hours before his body was discovered on the morning of February 16. Based upon this estimate, the medical examiner opined that the decedent died on February 15.

[¶11] At the close of the State's case, the defendant moved to dismiss the indictment, arguing that, as relevant to this appeal, there was insufficient evidence to prove beyond a reasonable doubt that the decedent died from a fentanyl overdose and that the defendant "dispensed the lethal dose." The trial court denied the motion. After a four-day trial, the jury convicted the defendant of selling a controlled drug resulting in death in violation of RSA 318-B:26, IX. This appeal followed.

4

## II.    Analysis

### A. Motion to Recuse

[¶12] On appeal, the defendant first argues that the trial court erred in denying his motion to recuse the SCAO based on the appearance of a conflict of interest.  He asserts that "[t]he Court should consider the nature of the conflict, the prejudice to the State if recusal is ordered, and the appearance of partiality associated with a small office prosecuting a defendant."

[¶13] We have yet to consider what standard to apply when reviewing a trial court's decision on a motion to recuse or disqualify an entire county attorney's office.  Other courts have reviewed similar trial court decisions for an abuse of discretion or under similar standards.  See, e.g., State v. McManus, 941 A.2d 222, 231 (R.I. 2008); State v. Baker, 934 A.2d 820, 821 (Vt. 2007); State v. Chambers, 533 P.3d 195, 198 (Ariz. 2023); Haraguchi v. Superior Court, 182 P.3d 579, 584 (Cal. 2008); United States v. Bolton, 905 F.2d 319, 321 (10th Cir. 1990).  In a different context, we have reviewed a decision on a motion to recuse a trial judge using an abuse-of-discretion standard.  See State v. Linsky, 117 N.H. 866, 883 (1977).  Although these cases apply an abuse-of-discretion standard, because the term "abuse of discretion" may carry an inaccurate connotation, we refer to it as the "unsustainable exercise of discretion" standard.  State v. Lambert, 147 N.H. 295, 296 (2001).  We agree with our sister courts, as well as our own analogous jurisprudence, and therefore will review the trial court's denial of the defendant's motion to recuse the SCAO based on the alleged conflict of interest for an unsustainable exercise of discretion.  To show that the trial court's decision is not sustainable, the defendant must demonstrate that the court's ruling was clearly untenable or unreasonable to the prejudice of his case.  Id.

[¶14] We begin by noting that the defendant concedes that there was no de facto conflict of interest between himself and the prosecutors handling the case.  Rather, he argues that based upon his relationship with the legal assistant, "an appearance of impropriety existed such that a reasonable person in the [the defendant's] position would have believed the [SCAO] should not have continued to handle the case."  The defendant asserts that, to avoid an appearance of impropriety, the case should be referred to another agency for re-prosecution.  We disagree.

[¶15] Prosecutors have a "duty to the public to achieve justice and a duty to the defendant to never lose sight of the fact that the defendant is entitled to a full measure of fairness."  Rogowicz v. O'Connell, 147 N.H. 270, 274 (2001) (quotation and brackets omitted).  Pursuant to New Hampshire Rule of Professional Conduct 1.11(d)(1), a lawyer serving as a public officer or employee is explicitly subject to the conflict-of-interest provisions set forth in Rules 1.7

and 1.9. Accordingly, we disagree with the trial court's legal conclusion that Rule 1.7 does not apply to prosecutors.

[¶16] However, any conflict of interest arising from the relationship between the defendant and the county attorney's legal assistant cannot be imputed to the rest of the SCAO. The general rule of imputation of conflicts of interest set forth in New Hampshire Rule of Professional Conduct 1.10 does not apply to the regulation of conflicts of public officers and employees set forth in Rule 1.11. See N.H. R. Prof. Conduct 1.11, 2004 ABA Model Code Comment [2] ("Rule 1.10 is not applicable to the conflicts of interest addressed by this Rule . . . . Because of the special problems raised by imputation within a government agency, paragraph (d) does not impute the conflicts of a lawyer currently serving as an officer or employee of the government to other associated government officers or employees, although ordinarily it will be prudent to screen such lawyers."). Thus, to the extent that the circumstances of this case presented a material, concurrent conflict of interest for the county attorney or his assistant, see N.H. R. Prof. Conduct 1.7(a), any such conflict is not imputed to the entire office.

[¶17] Moreover, as the trial court found, the measures taken by the SCAO were sufficient to avoid a conflict of interest. The Strafford County Attorney, whom the legal assistant directly supports, recused himself from the case. Additionally, the legal assistant had no access to the case file, members of the office were instructed not to speak with the legal assistant about the case, and the legal assistant did not directly support either of the attorneys assigned to prosecute the case. Accordingly, based on the facts before us, we agree with the trial court that the coworker relationship between the legal assistant and the prosecuting attorneys, especially given the screening procedures in place, was insufficient to warrant the disqualification of the SCAO.

[¶18] The defendant also claims that the legal assistant's initiation of the ex parte parenting proceeding after he was indicted created the appearance of impropriety. The trial court credited the State's representations that the prosecutors never discussed with the legal assistant the implications of indicting the defendant. The trial court noted that "there is no evidence that [the legal assistant] has used this prosecution to leverage the custody issue on a long term or permanent basis. Rather, it appears that [the legal assistant] sought custody on an ex parte basis under the circumstances in order to simply protect [her child]." Because the legal assistant obtained the ex parte order only after the defendant's indictment became public, we are unpersuaded that her actions evidence the appearance of a conflict of interest that could be imputed to the entire SCAO.

[¶19] Finally, we note that while the defendant emphasizes "the appearance of partiality associated with a small office prosecuting a defendant

6

where one of its employees was an adverse witness," the legal assistant did not testify at either of the defendant's trials. Thus, the jury was never presented with any testimony by the legal assistant that could have created the appearance of impropriety. After considering all of these factors, we conclude that the trial court sustainably exercised its discretion by denying the defendant's motion to recuse the SCAO.

B. Sufficiency of the Evidence

[¶20] The defendant next argues that the State introduced insufficient evidence to convict him of dispensing a controlled drug – death resulting. See RSA 318-B:26, IX. Specifically, he asserts that the evidence was insufficient to prove beyond a reasonable doubt that the decedent died of acute fentanyl toxicity and that the defendant was the source of the lethal fentanyl dose.

[¶21] A challenge to the sufficiency of the evidence raises a claim of legal error; therefore, our standard of review is de novo. State v. Folley, 172 N.H. 760, 766 (2020). When considering such a challenge, we objectively review the entire record, including any evidence presented by the defendant, to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, considering all the evidence and all reasonable inferences drawn therefrom in the light most favorable to the State. Id. We examine each evidentiary item in the context of all the evidence, and not in isolation. Id.

[¶22] The defendant has the burden of demonstrating that the evidence was insufficient to prove guilt. Id. When the evidence is solely circumstantial, a defendant challenging sufficiency must establish that the evidence does not exclude all reasonable conclusions except guilt. See State v. Saintil-Brown, 172 N.H. 110, 117 (2019). However, when the proof involves both direct and circumstantial evidence, we apply the standard set forth in Folley and uphold a jury's verdict unless no rational trier of fact could have found guilt beyond a reasonable doubt. Folley, 172 N.H. at 766.

[¶23] Under RSA 318-B:26, IX:

Any person who manufactures, sells, or dispenses methamphetamine, lysergic acid, diethylamide phencyclidine (PCP) or any other controlled drug classified in schedules I or II, or any controlled drug analog thereof, in violation of RSA 318-B:2, I or I-a, is strictly liable for a death which results from the injection, inhalation or ingestion of that substance, and may be sentenced to imprisonment for life or for such term as the court may order.

The defendant has conceded that he knowingly dispensed fentanyl to the decedent and that the decedent ingested the fentanyl. Based, in part, on these

7

concessions, we conclude that direct and circumstantial evidence supported the defendant's conviction.

[¶24]  First, the defendant contends that the evidence was insufficient to prove beyond a reasonable doubt that the decedent died of acute fentanyl toxicity.  Specifically, he contends that the evidence regarding the decedent's cause of death was insufficient because no autopsy was performed, there was no investigation into the decedent's medical history, and the medical examiner testified that the decedent "probably died of a fentanyl overdose."  We disagree.  As an initial matter, the defendant mischaracterizes the medical examiner's testimony about the certainty of her conclusion regarding the decedent's cause of death.  The medical examiner testified that she was "at least 94.5 percent confident that [the decedent] died from a fentanyl overdose."  At no point did she testify that the decedent "probably" died of a fentanyl overdose.  Rather, she explained that her office did not perform an autopsy because this case was not a close call, and there was "no doubt about it in [her] mind" that the decedent died from a fentanyl overdose.

[¶25]  The medical examiner explained that the reason an autopsy was not performed in every overdose death in 2018 was because the "caseload is just too high."  She testified that in practice, she will forgo an autopsy when a decedent had a history of drug use, was previously well and had no known major medical problems, the body was discovered in the presence of drugs and drug paraphernalia, and there is no other reasonable explanation for the death.  She explained that, if each of these factors is present, "an autopsy [would be] unlikely to add anything other than to confirm that there was no other cause of death in that case."

[¶26]  Here, the State presented evidence that each of these factors was present, and the medical examiner expressly testified that all of the aforementioned factors were present in the decedent's case.  The decedent's mother and Miltner both testified about the decedent's history of drug use, and the medical examiner testified that the decedent had no known medical conditions that could manifest as a sudden, unexpected death.  The toxicology report tested positive for fentanyl, and the medical examiner identified injection sites on the decedent's arm.  Further, police officers testified that drug paraphernalia was found on the table next to the decedent's body in the motel room.  Based on this information and the medical examiner's training and experience, the medical examiner testified that she felt confident opining that the decedent died from acute fentanyl toxicity.  We thus conclude that the defendant has not met his burden of demonstrating that, when viewed in the light most favorable to the State, the evidence was insufficient to prove that the decedent died of acute fentanyl toxicity.

[¶27] The defendant next argues that, assuming the decedent died of acute fentanyl toxicity, the evidence was insufficient to prove beyond a

8

reasonable doubt that the defendant was the source of the lethal fentanyl dose. The defendant asserts that the evidence at trial gave rise to an alternative conclusion consistent with innocence: that the decedent obtained the lethal fentanyl dose from a different source. This theory is based upon Miltner's testimony that he and the decedent inhaled, rather than injected, at least some of the fentanyl supplied by the defendant, police officers' testimony that a syringe and other drug paraphernalia used to inject drugs were found in the decedent's room, and the decedent's mother's suggestion that there was another known dealer at the motel.

[¶28] The defendant claims that the decedent could have obtained drugs from another source after Miltner left the motel. He contends that "there was substantial testimony that Miltner and [the decedent] used most, if not all, of the half-gram package that Miltner supplied," and, therefore, the decedent could have obtained and used other drugs, causing his death. However, there was evidence that the decedent had only twenty dollars — the money his mother gave him for food — and, as a result, Miltner had to contribute twenty dollars toward the purchase of the "40" of fentanyl. No evidence supports the defendant's hypothesis that the decedent obtained additional funds with which to purchase fentanyl after the defendant and Miltner left the motel. Additionally, although Miltner testified that he inhaled some of the fentanyl that the decedent purchased from the defendant, Miltner consistently stated that he did not remember how much fentanyl he inhaled or whether any unused amount remained after he left the decedent's room. Thus, the defendant's statement that Miltner and the decedent used "most, if not all" of the fentanyl is an overstatement. No evidence suggests that the decedent solicited the purchase of more fentanyl from another source after obtaining the "40" from the defendant.

[¶29] The defendant nonetheless argues that the decedent could have obtained fentanyl after his transaction with the defendant on February 15 because: (1) the medical examiner estimated that the decedent could have died any time before midnight on February 15, thus putting several hours between Miltner's departure and the decedent's death; (2) the motel manager testified that she witnessed the decedent crossing the parking lot at approximately midnight that night; and (3) there is evidence that another known drug dealer was staying at the same motel as the decedent. We reject this theory as speculative at best. Although the decedent messaged other sources looking for drugs before Miltner and the defendant arrived at his room, his phone records indicate that he did not send or respond to any messages after 2:12 p.m. Miltner testified that he arrived at the decedent's motel room shortly after 2 p.m. and was with the decedent for, at most, ten to fifteen minutes. Between 2:12 p.m. on February 15 and the time when the decedent's body was found the following morning, the decedent received sixty-one messages, and he responded to none of them.

9

[¶30] Further, although the motel manager testified that she saw the decedent across the parking lot after midnight on February 16, she admitted that she never mentioned seeing the decedent that night to the police. The manager also acknowledged that she did not know the decedent well and that the parking lot was dark when she allegedly saw him. The existence of any inconsistencies in the manager's testimony was a factor for the jury to consider in deciding the appropriate weight to be accorded the testimony. See State v. Carr, 167 N.H. 264, 275 (2015). The jury is free to accept or reject any portion of a witness's testimony and to resolve any conflicts in testimony. Id.

[¶31] For the foregoing reasons, we conclude that the defendant has failed to carry his burden of demonstrating that the evidence was insufficient to prove beyond a reasonable doubt that he was the source of the lethal fentanyl dose. Accordingly, we affirm the defendant's conviction.

Affirmed.

MACDONALD, C.J., and BASSETT and HANTZ MARCONI, JJ., concurred.